IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTIE ADEMILUYI,

    *Plaintiff, on behalf of herself and
others similarly situated,*

    v.

PENNYMAC MORTGAGE
INVESTMENT TRUST HOLDINGS
I, LLC, *et al.*,

    *Defendants.*

Civil Action No.: ELH-12-0752

## MEMORANDUM OPINION

Plaintiff Christie Ademiluyi filed a Class Action Complaint (the "Complaint," ECF 1) against defendants PennyMac Mortgage Investment Trust Holdings I, LLC ("PennyMac Holdings") and PennyMac Mortgage Investment Trust ("PennyMac Trust") (collectively, "PennyMac"), asserting claims under state and federal law, based on defendants' debt collection activities. Plaintiff contends, *inter alia*, that defendants operated as debt collection agencies in Maryland without obtaining the requisite debt collection license, in accordance with the Maryland Collection Agency Licensing Act ("MCALA"), Md. Code (2010 Repl. Vol., 2012 Supp.), § 7-301 of the Business Regulation Article ("B.R."). She seeks damages in excess of $8,500,000.

In particular, Count I, styled as a claim for "Class Declaratory Judgment and Injunctive Relief," seeks a declaration that defendants unlawfully engaged in debt collection practices. In addition, plaintiff seeks to enjoin defendants' allegedly unlawful conduct, and requests disgorgement of "all amounts that each has obtained while acting illegally as a debt collection agency without a license." Count II alleges that defendants' unlicensed debt collection activity violated various provisions of the Fair Debt Collection Practices Act ("FDCPA"), including 15

U.S.C. §§ 1692e & 1692f.   In Count III, plaintiff asserts that defendants' unlicensed debt collection activity constitutes mortgage fraud, in violation of the Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code (2010 Repl. Vol, 2012 Supp.), § 7-401 *et seq.* of the Real Property Article ("R.P.").   Count IV presents a claim for unjust enrichment, on the ground that defendants received benefits from their alleged unlawful debt collection activity.[1]

Pursuant to Fed. R. Civ. P. 12(b)(6), defendants have moved to dismiss ("Motion," ECF 10), and the Motion has been extensively briefed.[2]   No hearing is necessary to resolve it.   *See* Local Rule 105.6.   For the reasons that follow, the Motion will be granted in part and denied in part.[3]

---

[1]  As to plaintiff's federal claims, jurisdiction is proper under 28 U.S.C. § 1331. Supplemental jurisdiction may be exercised over plaintiff's state law claims under 28 U.S.C. § 1367.

[2]  Defendants filed a lengthy memorandum of law in support of the Motion ("Memo," ECF 10-1).   Plaintiff filed an "Opposition to Motion to Dismiss" ("Opp.," ECF 11), to which defendants replied ("Reply," ECF 12).   With leave of Court, both parties filed surreplies.   *See* Ademiluyi Surreply (ECF 20); PennyMac Surreply (ECF 22).   Included in plaintiff's motion to file a surreply was a "Request to Take Judicial Notice" of the "Maryland State Collection Agency Licensing Board's Memorandum as Amicus Curiae" in the case of *Fontell v. Hassett*, 870 F. Supp. 2d 395 (D. Md. 2012) (Williams, J.).   *See* ECF 15-2.   Additionally, plaintiff filed "Plaintiff's Second Motion & Request for the Court to Take Judicial Notice of Certain Public Records ("Plaintiff's Second Motion," ECF 23).   Defendants opposed Plaintiff's Second Motion (ECF 24), and plaintiff has replied (ECF 25).

[3]  As noted, in Count I plaintiff asserts claims for declaratory and injunctive relief, premised on the substantive legal claims asserted in Counts II, III and IV.   However, Count I "does not cite any federal or state statutes that *independently* entitle[s] the plaintiff[] to declaratory and injunctive relief."   *Hauk v. LVNV Funding, LLC*, 749 F. Supp. 2d 358, 369 (D. Md. 2010) (emphasis added).   In *Hauk*, Judge Blake rejected the argument that declaratory and injunctive relief are available for violations of the FDCPA under 28 U.S.C. §§ 2201 & 2202 or Md. Code (2006 Repl. Vol., 2012 Supp.), Cts. & Jud. Proc. § 3-406.   *Id.*

Moreover, plaintiff has conceded that Count I is moot, in light of the State of Maryland's issuance of a mortgage lender license to PennyMac Holdings.   *See* Plaintiff's Second Motion at 5 n.1.   This, too, is consistent with *Hauk*.   *See Hauk*, 749 F. Supp. 2d at 369 (finding claim for declaratory and injuctive relief moot where defendant similarly obtained mortgage lender license after filing of complaint).   Therefore, I will dismiss Count I as moot.

**Factual Background**

On April 30, 2007, plaintiff executed an Adjustable Rate Note for $465,000 (the "Note") with lender ABN AMRO Mortgage Group, Inc. ("ABN AMRO"), as to real property located at 8309 Maple Street in Laurel, Maryland.  Compl. ¶ 10; *see* Note, Motion Exh. A (ECF 10-3). The property is plaintiff's personal residence.  Compl. ¶ 38.  The Note was secured by the property, as reflected in the Deed of Trust dated April 30, 2007, which was recorded in the land records of Prince George's County, Maryland.  Deed of Trust, Motion Exh. B (ECF 10-4).[4]

In or about 2010, plaintiff fell behind on her mortgage payments to CitiMortgage, Inc. ("Citi"), successor-in-interest to the Note by merger with ABN AMRO.  *See* Assignment of Mortgage, Motion Exh. C ("Assignment," ECF 10-5); Compl. ¶ 33.  Between July 2010 and January 2011, in response to "an unaffordable loan modification" applied by Citi without plaintiff's consent, plaintiff and Citi negotiated "a modification or other loss mitigation alternatives," culminating in a forbearance agreement accepted by Ademiluyi on December 22, 2010.  *Id.* ¶¶ 34-36.  It "amended payments due on the original note and security instrument for seventeen months."  *Id.* ¶ 37.  Ademiluyi submitted her full application for a loan modification on January 10, 2011.  *Id.*

On or about March 9, 2011, while Ademiluyi's modification application was pending, Citi transferred its interest in the Note to PennyMac Holdings, without recourse.  Compl. ¶ 38;

---

[4] The documents underlying plaintiff's mortgage and defendants' interest in the loan are set forth to provide background for plaintiff's claims.  They "are referenced in the complaint, and . . . they provide the basis for the [plaintiff's] rights to the property and define the terms of [her] relationship with the lender, including when default occurs."  *Allen v. Bank of Am. Corp.*, Civ. No. CCB-11-33, 2011 WL 3654451, at *3 n.4 (D. Md. Aug. 18, 2011) (citing *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 996 (4th Cir. 1997)) (finding Deed of Trust and Note underlying plaintiff's mortgage integral to complaint, which alleged violations of FDCPA and State consumer protection laws and common law claims, all arising out of mortgage foreclosure activity).

*see* Assignment.  According to the Complaint, PennyMac Holdings "operates as a wholly-owned subsidiary of Defendant PennyMac Trust which also controls the day to day operations of Defendant PennyMac [Holdings] through the direction of its Board of Trustees and management staff."  Compl. ¶ 3; *see also id.* ¶ 19.  The Complaint also states: "PennyMac Trust was established as a Maryland investment vehicle commonly called and referred to as a real estate investment trust within the meaning of Section 856 of the Internal Revenue Code of 1986."  *Id.* ¶ 3.[5]

In a letter to Ademiluyi dated March 28, 2011, PennyMac Holdings represented that it had acquired ownership of the Note on February 28, 2011, but that Citi was, at that time, still the mortgage servicer.  Compl. ¶ 39.  On March 1, 2011 and March 31, 2011, Ademiluyi submitted her mortgage payments to Citi via "electronic funds transfer" in the amount of $2,605.68, presumably in accordance with the forbearance agreement.  *Id.* ¶ 40.[6]

According to the Complaint, in early April 2011, PennyMac Holdings transferred the servicing of the Note to PennyMac Loan Services, LLC ("PennyMac Services").  Compl. ¶ 41.[7] However, PennyMac Services refused Ademiluyi's April mortgage payment, submitted pursuant

---

[5] Defendants claim that PennyMac Holdings is a wholly owned subsidiary of PennyMac Operating Partnership, L.P., whose limited partner is PennyMac Trust.  *See* Memo at 5. According to defendants, PennyMac Trust is "merely a holding company . . . ."  *Id.*  As discussed, *infra*, the factual discrepancy cannot be resolved in the context of a motion to dismiss.

[6] Plaintiff specified the amounts paid, but did not indicate whether those amounts were submitted under the forbearance agreement.  However, because plaintiff subsequently alleged that April 2011 payments made pursuant to the forbearance agreement were rejected, the Court infers that the March 2011 payments were also made pursuant to that agreement.

[7] Plaintiff has not sued PennyMac Services.  According to defendants, PennyMac Services is "responsible for all of the servicing activities and interaction with mortgage consumers such as Plaintiff."  Memo at 2.  It performs "the day-to-day activities of loan administration, processing of payments . . . workout and loan resolution . . . initiating and monitoring foreclosure efforts . . . [and] other activities."  *Id.* at 5.  This factual information is not contained in the Complaint, however.

to the forbearance agreement, and subsequently represented to plaintiff's attorney that it was not bound by the forbearance agreement. *Id.* ¶¶ 42-43. Instead, PennyMac Services indicated that its "Making Home Affordable Loan Modification" was the sole option "to keep borrower's [sic] in their home." *Id.* ¶ 43. Nonetheless, PennyMac Services determined that Ademiluyi was not eligible for a loan modification, and that her only options to avoid foreclosure were to pay the entire past-due balance, conduct a short-sale, or relinquish the deed in lieu of foreclosure. *Id.* ¶ 44. And, on May 20, 2011, PennyMac Services represented that it had not received any payments from Ademiluyi since January 1, 2011. *Id.* ¶ 45. Plaintiff alleges that, despite endeavoring to "resolve her mortgage situation and the botched modification application," her attempts "have not resolved the situation." *Id.* ¶ 46.

On January 30, 2012, PennyMac Holdings sent plaintiff a Notice of Intent to Foreclose (the "Notice"). *Id.* ¶ 47. In the Notice, PennyMac Holdings identified itself as the "secured party" on the Note, and claimed that plaintiff had been in default as of January 1, 2011. *Id.* According to the Complaint, PennyMac Holdings also identified itself in the Notice as a "debt collector." *Id.* The Complaint does not indicate whether defendants actually foreclosed on plaintiff's property. Plaintiff alleges that, as a result of her attempts to remedy her loan modification dispute and to avoid foreclosure, she suffered damages in the form of attorney's fees, emotional distress, and monetary loss for the mortgage payments made to defendants. *Id.* ¶ 49. Further, she avers that she and "each class member reasonably relied upon PennyMac [Holdings'] and PennyMac Trust's direct and indirect representations that each was licensed and permitted to operate legally in the state of Maryland." *Id.* ¶ 50.

Plaintiff avers that PennyMac Holdings "collects on [mortgage] debts in the State of Maryland for the benefit of its owners and investors including PennyMac Trust." *Id.* ¶ 13.

These debts are allegedly in default at the time they are acquired by PennyMac Holdings.  *Id.*  As of December 31, 2011, almost 75% of the loans held by PennyMac Holdings were in default or in foreclosure status.  *Id.*  Further, the Complaint states that PennyMac Holdings "collects monthly mortgage payments and/or reinstatement sums through the mails and interstate wires," and "through civil litigation in Maryland Courts filed as foreclosure actions."  *Id.* ¶ 20.  And, through its affiliates, PennyMac Holdings offers $8,700 in "financial incentives" to borrowers for participating in a "foreclosure-avoidance program," which consists of a "deed-in-lieu of foreclosure or short sale of the property."  *Id.* ¶ 21.  Additionally, plaintiff claims that "in more than 50 occurrences in the State of Maryland in the last year," PennyMac Holdings "attempted to collect debts against Maryland consumers through foreclosure[] collection actions filed in Maryland state courts and Maryland land records as well as claims reported to the U.S. Bankruptcy Court for Maryland."  *Id.* ¶ 18.

Neither PennyMac Holdings nor PennyMac Trust is licensed as a debt collection agency in the State of Maryland, pursuant to the MCALA.  *Id.* ¶ 15.  And, according to the Complaint, PennyMac Holdings is not licensed as a Maryland mortgage lender.  *Id.* ¶ 14.[8]  However, the parties agree that the Court may take judicial notice of defendants' licensing status represented via the Nationwide Mortgage Licensing System ("NMLS") website, available at www.nmlsconsumeraccess.org.[9]  *Cf. Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, No. 12-

---

[8] After suit was filed in this case, PennyMac Holdings registered as a Maryland mortgage lender.  *See* Plaintiff's Second Motion.

[9] According to the NMLS website, "NMLS is the legal system of record for licensing in all participating states, the District of Columbia, and U.S. Territories. In these jurisdictions, NMLS is the official and sole system for companies and individuals seeking to apply for, amend, renew, and surrender licenses managed in the NMLS on behalf of the jurisdiction's governmental agencies. NMLS itself does not grant or deny license authority."  *See* NMLS Consumer Access, Frequently Asked Questions, available at http://mortgage.nationwidelicensingsystem.org/consumer/resources (last visited Feb. 20, 2013).

1724, 2013 WL 541044, at *4 (4th Cir. Feb. 14, 2013) ("A court may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute and 'it is capable of accurate and ready determination.'") (quoting Fed. R. Evid. 201(b)).[10]   These records show that PennyMac Services holds a license as a mortgage lender under Maryland law.

### Standard of Review

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008); *see Aschroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

Whether a complaint adequately states a claim for relief is judged by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Twombly*, 550 U.S. at 554-55.  Rule 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."   Although the plaintiff need not include "detailed factual allegations," the rule demands more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555.  To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the]

---

[10] Plaintiff initially contested defendants' reliance on the NMLS website.  However, in Plaintiff's Second Motion, plaintiff acknowledges that the Court may take judicial notice of the NMLS website with respect to PennyMac Holdings' license as a Maryland mortgage lender. Given the parties' agreement, I will take judicial notice of both licenses, although neither is material to the resolution of the Motion to Dismiss.

actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (brackets in original) (internal quotation marks omitted).  A complaint is insufficient if it provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555.

Notably, the court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).  However, the court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385-86 (4th Cir. 2009).  And, if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (citation omitted).

Typically, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint," the court may resolve the applicability of a defense by way of a Rule 12(b)(6) motion.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6).  *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

In resolving a motion under Rule 12(b)(6), a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).  But, under Fed. R. Civ. P. 12(d), a district court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C Wright & Miller, Fed. Prac. & Pro. § 1366, at 159 (3d ed. 2004, 2011 Supp.); *see Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012).  Generally, if a court considers material outside of the pleadings, "the motion must be treated as one for summary judgment under Rule 56," in which case "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

There are some limited exceptions, however.  For instance, the court may properly consider documents "attached to the complaint, as well those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citations omitted).  Here, the Note, the Deed of Trust, the Assignment, and the Notice "are referenced in the complaint, and they are integral, as they provide the basis for the plaintiff['s] rights to the property and define the terms of [her] relationship with the lender, including when default occurs." *Allen*, 2011 WL 3654451 at *3 (citing *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 996 (4th Cir. 1997)).  Accordingly, they may be considered without converting the motion to one for summary judgment.

Additionally, facts and documents subject to judicial notice may be considered by a court, without converting the motion under Rule 12(d). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011).   I will take judicial notice of the fact that both PennyMac Holdings and PennyMac Services hold licenses to act as mortgage lenders in the State of Maryland, as represented on the NMLS website, the authenticity of which is not in dispute. *See Jeandron*, 2013 WL 541044 at *4.   And, the legislative history of the MCALA, attached by both parties to their various submissions, may be considered as a matter of law, without necessitating judicial notice. *See Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226-27 (1959); *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995) ("For purposes of Rule 12(b)(6), the legislative history of an ordinance is not a matter beyond the pleadings but is an adjunct to the ordinance which may be considered by the court as a matter of law."), *rev'd on other grounds*, 517 U.S. 1206 (1996).

Nevertheless, I will disregard the defendants' other exhibits, including a Form 10K filed by PennyMac Trust on December 31, 2011, because they do not fall under the exceptions delineated above.   To be sure, a court may take judicial notice of relevant public records. *Philips*, 572 F.3d at 180.   However, because the relationship between PennyMac Holdings, PennyMac Trust, and PennyMac Services is disputed by the parties and is specifically at issue, it would be inappropriate to take judicial notice of the content of the Form 10K without an opportunity for further factual development by way of discovery. *See* Fed. R. Evid. 201 (indicating that a judicially noticed fact must not be subject to reasonable dispute); *e.g.*, *It's My Party, Inc. v. Live Nation, Inc.*, Civ. No. JFM-09-547, 2012 WL 78795, at *2 (D. Md. Jan. 10, 2012) ("While the fact of the filings and proceedings is capable of accurate determination by

resort to the public record, the truth of the contents of the exhibits is open to reasonable dispute.").

With respect to plaintiff's various motions to take judicial notice, they will be granted to the extent that they accord with the standard of review. *See* Fed. R. Evid. 201; *e.g.*, *It's My Party*, 2012 WL 78795 at *2. As to plaintiff's initial request for judicial notice of the amicus brief submitted by the Maryland State Collection Agency Licensing Board (the "Board") in the case of *Fontell v. Hassett*, 870 F. Supp. 2d 395, *see* ECF 15, I will take judicial notice of the fact that such a brief was submitted, but not the contents of the brief. The brief represents the Board's views as to the application of a provision in the MCALA, set forth in R.P. § 7-102(b)(10)(iii), which provides an exception for persons collecting debt for another when related by common ownership. That provision is not the basis of defendants' arguments, however. Furthermore, to the extent that the Board's views are pertinent here, they state conclusions of law that are presently disputed by the parties, and therefore may be considered, but not judicially noticed as true. *See It's My Party*, 2012 WL 78795 at *2. In Plaintiff's Second Motion, she asks the court to take judicial notice of PennyMac Holdings' application for and receipt of a mortgage lender license in the State of Maryland. *See* ECF 23. I will take judicial notice of the fact that PennyMac Holdings applied for and received a mortgage lender license. But, I will not take judicial notice of the representations made in the application because, to the extent that the contents of that application and the inferences that plaintiff derives therefrom are relevant here, they are disputed by the parties. *See It's My Party*, 2012 WL 78795 at *2. In any event, neither of these requests is dispositive of the Motion.

## Choice of Law

Although this case involves principles of both state and federal law, neither party has addressed choice of law.  Rather, the parties have briefed the issues as if substantive Maryland law governs plaintiff's state law claims, without any discussion or analysis.  The law of the forum state, Maryland, guides this Court's choice-of-law analysis.  *Chattery Int'l, Inc. v. JoLida, Inc.*, Civ. No. WDQ-10-2236, 2012 WL 1454158, at *3 n.10 (D. Md. Apr. 24, 2012) ("Federal courts with supplemental jurisdiction over a state law claim apply the choice of law rules of the forum state."); *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011) ("In a federal question [claim] that incorporates a state law issue, a district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise.").

Insofar as plaintiff is alleging damages for statutory violations of the FDCPA and the MMFPA, premised on violations of the MCALA, her claims sound in tort.  *See Curtis v. Loether*, 415 U.S. 189, 195 (1974) ("A damages action under the [the Fair Housing Act] sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach."); *J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990) ("A cause of action for breach of a duty imposed by statute or case law, and not by contract, is a tort action.").  In tort cases, Maryland courts apply *lex loci delicti*, *i.e.*, the law of the "place of the alleged harm."  *See Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010).  Because the injuries alleged here occurred in Maryland, I will look to Maryland law, where necessary, with respect to plaintiff's claims sounding in tort.  This is consistent with the parties' view.

With respect to plaintiff's claim for unjust enrichment, Maryland law also governs. Maryland's choice of law for an unjust enrichment claim follows the choice of law for a contract claim. *See Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490–92, 790 A.2d 720, 728–29 (2002) (stating that *lex loci contractus*, "the place the contract was made," determines choice of law in contract disputes and unjust enrichment claims). And, "[c]ontracts relating to the sale of realty are generally governed by the law of the jurisdiction in which the property is located." *Traylor v. Grafton*, 273 Md. 649, 660, 332 A.2d 651, 659 (1975). Because plaintiff's mortgage was executed in Maryland and relates to real property located in Maryland, *see* Note, plaintiff's claim for unjust enrichment is governed by Maryland law. Again, this is consistent with the parties' position.

It is less clear, however, that Maryland law governs as to the issue of piercing the corporate veil—the theory employed by plaintiff to hold PennyMac Trust liable for the conduct of PennyMac Holdings, discussed *infra*. Indeed, this Court is not aware of any Maryland case articulating a controlling choice-of-law principle as to veil piercing. Courts in this District have applied the law of the jurisdiction in which the corporation subject to "piercing" is incorporated. *See, e.g.*, *Meisel v. Ustaoglu*, Civ. No. 98–3863, 2000 WL 33374486 (D. Md. March 31, 2000) (citing *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996)). However, those cases cite to a Seventh Circuit decision, which relied on *Illinois* choice-of-law principles, and not those of Maryland. *See Stromberg*, 77 F.3d at 933 (stating, under Illinois law, that "'efforts to pierce the corporate veil' are governed by the law of the state of incorporation") (citation omitted).

PennyMac Holdings is a Delaware corporation. But, in connection with violations of a Maryland statute, Maryland courts have not hesitated to apply Maryland law where a plaintiff

seeks to pierce the veil of an out-of-state corporation.  *See, e.g.*, *Ramlall v. MobilePro Corp.*, 202 Md. App. 20, 30, 30 A.3d 1003, 1009 (2011) (applying Maryland law where plaintiff sought to pierce veil of Delaware corporation for failure to pay bonus fee, allegedly in violation of Maryland Wage Payment and Collection Law).  Additionally, piercing the corporate veil is not an independent cause of action, "'but rather is a means of imposing liability on an underlying cause of action.'"  *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (citation omitted).  Thus, the same principles that justify Maryland's choice-of-law rules as to the underlying causes of action here, which result in the application of Maryland law, would seem to hold in the context of veil piercing.

Maryland choice-of-law principles contain guidance for courts when the parties fail to address a choice-of-law issue.  In *Chambco, Div. of Chamberlin Waterproofing & Roofing, Inc. v. Urban Masonry Co.*, 338 Md. 417, 421, 659 A.2d 297, 299 (1995), the Maryland Court of Appeals said:

> Where the parties to an action fail to give . . . notice of an intent to rely on foreign law, and where it is clear that one or more issues in the case are controlled by another jurisdiction's law, a court in its discretion may exercise one of two choices with respect to ascertaining the foreign law.  First, the court may presume that the law of the other jurisdiction is the same as Maryland law.  Alternatively, the court may take judicial notice of the other state's law.  This discretion may be exercised by either the trial court, or by an appellate court . . . .

*Accord Felland Ltd. P'ship v. Digi-Tel Commc'ns, LLC*, 384 Md. 520, 530 n.1, 864 A.2d 1027, 1033 n.1 (2004).

Here, the parties have relied upon Maryland law and have not identified any relevant legal principles that might differ in other jurisdictions.  *See Ohio Sav. Bank v. Progressive Cas. Ins. Co.*, 521 F.3d 960, 962 (8th Cir. 2008) ("Like the district court, we will ignore what might be a complex choice of law analysis because the parties have not identified a relevant state law

conflict."); *Cleaning Auth., Inc. v. Nubert*, 739 F. Supp. 2d 807, 820 (D. Md. 2010) ("'Choice-of-law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes.'") (citation omitted).    Accordingly, except with respect to the issues of federal law that control plaintiff's FDCPA claims, I will resolve the parties' disputes by applying Maryland law, in accordance with the *Chambco* presumption that, to the extent that the law of any other jurisdiction ought to govern, it is the same as the law of Maryland.

### Discussion[11]

The centerpiece of plaintiff's claims is the allegation that the PennyMac defendants engaged in debt collection activity without the requisite State of Maryland license.  Nonetheless, because the MCALA does not provide a private right of action, plaintiff cannot obtain relief directly under that statute.  *See* B.R. § 7-401; *Fontell*, 870 F. Supp. 2d at 410.  Rather, plaintiff claims that, because defendants engaged in unlicensed debt collection activity in violation of Maryland law, they also violated the FDCPA; that defendants' unlicensed debt collection activities constituted mortgage fraud; and that defendants were unjustly enriched as a result of their unlawful activity.

In response, defendants offer a number of contentions.  First, defendants argue that, for plaintiff to prevail as to any cause of action against PennyMac Trust, she must establish a basis to pierce the corporate veil.  In their view, the Complaint does not allege facts sufficient to do so in this case.  Second, defendants maintain that the PennyMac defendants are not collection

---

[11] Before considering defendant's contentions, I pause to note that several of defendants' arguments are based on their version of facts, not contained in the Complaint, or facts that are contrary to the allegations in the Complaint.  For example, the Complaint does not refer to PennyMac Trust's Form 10-K, on which defendants' rely.  *See e.g.*, Memo at 5-6, 22-23; *see also* Opp. at 10-14.  At this juncture, I must accept, as true, all of the well pleaded averments contained in the Complaint.

agencies under the MCALA.   And third, defendants contend that the Complaint fails to state a

claim for relief under the FDCPA, or for mortgage fraud, unjust enrichment, or declaratory and

injunctive relief.

      I.      <u>Whether PennyMac Trust may be held liable for the acts of PennyMac Holdings</u>

      It is well settled that "[a] corporation exists as a legal entity separate and distinct from its

corporate shareholders." *Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d

1044, 1047 (4th Cir. 1988).   Therefore, "under the doctrine of limited liability, a shareholder—

including a corporate parent—may not be held liable for the acts of a corporation." *Allen*, *supra*,

2011 WL 3654451 at *4 (citing *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir.

1987)).   "Th[is] concept is expressed by the colorful metaphor of the corporate veil, which

presumes that acts of the corporation are not acts of the shareholder." *Johnson*, 814 F.2d at 980.

The corporate veil doctrine "is a basic attribute of the corporate form; it encourages business

investment and fosters stability in commercial transactions." *Cancun Adventure*, 862 F.2d at

1047.

      For liability purposes, an LLC is treated like a corporation. *Allen v. Dackman,* 413 Md.

132, 153, 991 A.2d 1216, 1228-29 (2010).   Moreover, under the Maryland Code (2007 Repl.

Vol., 2012 Supp.), § 4A-301 of the Corporations & Associations Article, members of limited

liability companies are not "personally liable for the obligations of the limited liability company,

whether arising in contract, tort or otherwise, solely by reason of being a member of the limited

liability company."

      In *Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.*, 275 Md. 295, 340 A.2d 225, 234

(1975), the Maryland Court of Appeals observed that, in the absence of fraud or unless necessary

to enforce a paramount equity, shareholders are generally not liable for the acts of a corporation.

It said, *id*. at 310, 340 A.2d at 234:

> The most frequently enunciated rule in Maryland is that although courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity.

*Accord Ramlall*, 202 Md. at 30, 30 A.3d at 1009.[12]

In *Cancun Adventure*, 862 F.2d at 1047, the Fourth Circuit recognized that "[s]ubstantial ownership of a corporation by a single individual is not alone sufficient to pierce the corporate veil." Although the *Cancun* Court acknowledged that the corporate veil "is not sacrosanct," it cautioned that "[a] court's power to pierce the corporate veil and impose liability on a shareholder in his individual capacity [must] be exercised with extreme circumspection." *Id*. With respect to a parent corporation and its subsidiary, a court will pierce the corporate veil to reach a parent corporation when the parent "dominates [its] subsidiary 'to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation.'" *Johnson*, 814 F.2d at 981 (citation omitted).

Here, the Complaint avers that PennyMac Holdings "operates as a wholly-owned subsidiary of Defendant PennyMac Trust which also controls the day to day operations of

---

[12] As noted, I will apply Maryland law to the issue of veil piercing. However, even if I were to apply the law of Delaware, the state of incorporation of PennyMac Holdings, Delaware applies an equally strict standard, under which "a corporate parent will only be held liable for the obligations of its subsidiaries 'upon a showing of fraud or some inequity.'" *Grasty v. Michail*, No. Civ. A. 02C-05-89, 2004 WL 396388, at *1 (Del. Super. Ct. Feb. 24, 2004) (quoting *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989)). Under Delaware law, "[t]he degree of control that would be required to 'pierce the veil' and hold the parent corporation liable would be a degree of control by the parent corporation that the subsidiary no longer has legal or independent significance of its own." *O'Leary v. Telecom Res. Serv., LLC*, Civ. No. 10C-03-108-JOH, 2011 WL 379300, at *7 (Del. Super. Ct. Jan. 14, 2011).

Defendant PennyMac [Holdings] through the direction of its Board of Trustees and management staff," Compl. ¶ 3, and that "[t]he use of PennyMac [Holdings] to engage in illegal activities is beyond the purposes for which PennyMac [Holdings] is permitted to operate as a separate legal entity and therefore PennyMac [Holdings] is not a separate legal entity." *Id.* ¶ 15. Further, plaintiff claims that, with respect to her substantive claims under the FDCPA, "since PennyMac [Holdings] is a wholly-owned subsidiary [of PennyMac Trust], PennyMac Trust has indirectly attempted and/or actually collected in the same number of occurrences by indirectly collecting through PennyMac [Holdings]." *Id.* ¶ 19. The Complaint concludes that "PennyMac Trust is liable for the acts of PennyMac [Holdings]." *Id.* ¶ 15.

To buttress her claim of liability based on corporate veil piercing, plaintiff seizes on Judge Bennett's statement in *Winemiller v. Worldwide Asset Purchasing, LLC*, Civ. No. RDB-09-2478, 2011 WL 1457749, at *3 (D. Md. Apr. 15, 2011), to the effect that a parent company may be held liable for actions taken by its subsidiaries, as agents, "under the theory of respondeat superior, even as 'passive' members of a larger business entity." In support of this proposition, Judge Bennett relied on the Maryland Court of Appeals's decision in *Allen v. Dackman*, *supra*, which stated, 413 Md. at 154, 991 A.2d at 1229: "An LLC member is liable for torts he or she personally commits, inspires, or participates in because he or she *personally* committed a wrong, not 'solely' because he or she is a member of the LLC." (Emphasis added).

As a review of *Dackman* indicates, the proposition on which Judge Bennett relied was directed at corporate officials who, because they were members of an LLC, sought to shield themselves from individual liability for acts taken in their capacity as officials by invoking the LLC's corporate form. *See id.* (collecting cases). That is entirely unlike the case *sub judice*, in which plaintiff seeks to hold PennyMac Trust liable because it allegedly controls the day-to-day

operations of PennyMac Holdings, but not because it personally committed those acts itself. Moreover, Judge Bennett had no occasion in *Winemiller* to examine Maryland's restrictive view in regard to piercing the corporate veil.

The Complaint does not allege facts that, even if true, would establish that PennyMac Trust is liable for the conduct of PennyMac Holdings. Plaintiff offers only conclusory assertions as to control allegedly exerted by PennyMac Trust over PennyMac Holdings. For example, plaintiff does not allege that PennyMac Trust itself committed, inspired, or participated in the wrongs alleged. Moreover, plaintiff does not claim that PennyMac Trust held an interest in any mortgage debt, let alone plaintiff's mortgage. And, plaintiff does not assert facts showing that PennyMac Trust communicated with or serviced plaintiff's debt payments. *See Antigua Condominium Ass'n v. Melba Invs. Atl., Inc.*, 307 Md. 700, 735, 517 A.2d 75, 93 (1986) ("The Plaintiffs do not allege any ground of [the parents corporation's] liability to them which is independent of [subsidiary's] alleged liability to them. The entire thrust of the allegations against [the parent corporation] is an attempt to reach [it] through piercing the corporate veil of [the subsidiary].").  Nor is there a claim that the parent and subsidiary commingled funds or assets, or that the parent misused funds of the subsidiary, or otherwise disregarded the corporate structure. *See Cancun Adventure*, 862 F.2d at 1047-48.

When a plaintiff seeks to pierce the corporate veil, the complaint must offer more than general and conclusory allegations of fraud, undue control exercised by a parent over its subsidiary, or paramount equity. *Antigua*, 307 Md. at 736, 517 A.2d at 93. To justify veil piercing on the basis of fraud, for example, the plaintiff "would have to show that [the parent's] *use of* [the subsidiary] worked a fraud against [her]." *Id.* at 735, 517 A.2d at 93 (emphasis

added).   As the Maryland Court of Appeals explained, "[a] plaintiff must allege facts which indicate fraud or from which fraud is necessarily implied." *Id.* at 736, 517 A.2d at 93.

In *Antigua*, the Maryland Court of Appeals affirmed the dismissal of a complaint in which the plaintiff sought to pierce the corporate veil, even though the plaintiff alleged that the "subsidiary corporation was the service company of the parent savings and loan" and "operated out of the offices of the parent using persons on the payroll of the parent." *Id.* (citing *Starfish Condo. Ass'n v. Yorkridge Serv. Corp.*, 295 Md. 693, 714-15, 458 A.2d 805, 816 (1983)). And, to this Court's knowledge, no Maryland appellate court has issued a reported opinion allowing veil piercing to enforce a "paramount equity." *See Ramlall*, 202 Md. App. at 30, 30 A.3d at 1009.   Indeed, "[t]his standard has been so narrowly construed that neither [the Maryland Court of Special Appeals] nor the [Maryland] Court of Appeals has ultimately 'found an equitable interest more important than the state's interest in limited shareholder liability.'" *Serio v. Baystate Props., LLC*, ___ Md. App. ____, ___ A.3d ____, 2013 WL 285393, at *7 (Jan. 25, 2013) (quoting *Residential Warranty v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 307 n.13, 728 A.2d 783, 789 n.13 (1999)).   Even where a party seeks to hold a shareholder liable for conduct that was "clearly designed to cause the corporation to evade a legal obligation" and "had the effect of rendering [the corporation] 'all but insolvent,'" paramount equity does not justify piercing the veil. *Hildreth v. Tidewater Equip. Co.*, 378 Md. 724, 738-39, 838 A.2d 1204, 1212-13 (2003) (quoting *Bart Arconti*, 275 Md. at 305, 340 A.2d at 231).

Several decisions issued in this District provide guidance. *See, e.g.*, *Haley Paint Co. v. E.I. Dupont de Nemours & Co.*, 775 F. Supp. 2d 790, 799-800 (D. Md. 2011) (Bennett, J.); *Newman v. Motorola, Inc.*, 125 F. Supp. 2d 717, 723 (D. Md. 2000) (Blake, J.).   For example, in seeking to establish personal jurisdiction over the foreign parent corporation by virtue of service

on the domestic subsidiary, the plaintiff in *Haley Paint* alleged that the parent "exerted considerable control over the activities and operations" of its subsidiary, a Delaware corporation, and claimed that the parent held a "direct and controlling ownership interest in the subsidiary," controlled the subsidiary's "marketing, purchasing, pricing, management, and/or operating policies," and approved its "significant business decisions." 775 F. Supp. 2d at 799-800.  The court found that plaintiff's "broad allegations" as to control were insufficient to justify piercing the corporate veil, *id.* at 800, particularly as the subsidiary was a separate corporate entity, held its own articles of incorporation, maintained its own corporate records, and filed its own taxes. *See id.* at 793.

Similarly, in *Newman* the court declined to pierce the veil in order to obtain personal jurisdiction over the corporate parent, even though the subsidiary's SEC filings indicated that the parent "will control [the subsidiary's] management and affairs," and the two entities had filed consolidated financial statements and tax returns. 125 F. Supp. 2d at 723.  The court said, *id.*:

> These allegations are insufficient to warrant piercing the corporate veil when [the subsidiary] exists as a separate corporate entity, maintains its own financial records, has a separate purpose, and when there has been no allegation that it exists solely as a sham corporation. . . .  Further, the fact that [the parent] will control certain decisions and even must approve changes does not mean the two companies operate as one.

To be sure, both *Haley Paint* and *Newman* presented the issue of veil piercing with respect to the matter of personal jurisdiction, and Maryland courts have employed a particular standard of agency in that context.  *See Newman,* 125 F. Supp. 2d at 722-23.  Under that standard, the parent must exert "considerable control over the activities of the subsidiary," and a court will also consider "whether significant decisions of the subsidiary must be approved by the parent," whether the entities keep separate books and records, use separate accounting procedures, and hold separate directors' meetings.  *Id.* at 723.  Additionally, veil piercing may be

justified if the subsidiary is merely a sham corporation. *See id.* If anything, however, the standard adopted by Maryland courts with respect to the exercise of personal jurisdiction based on veil piercing is broader and more relaxed than that of veil piercing on the merits of a claim.

The allegations here as to the exercise of PennyMac Trust's control over PennyMac Holdings are more conclusory than the allegations found deficient in *Haley Paint* and *Newman*, and do not compare to what was deemed adequate in *Cancun Adventure Tours, Inc.* to support veil piercing. Like the plaintiff in *Antigua*, 307 Md. at 735-36, 517 A.2d at 93, Ademiluyi merely relies on the fact that PennyMac Trust is the sole shareholder of PennyMac Holdings and supposedly manages its "Board of Trustees" (though, notably, plaintiff does not specify how such direction occurs). Particularly in light of the pleading standard set forth in *Iqbal* and *Twombly*, plaintiff's conclusory allegations in the Complaint, even if proven, are not sufficient to justify the piercing of the corporate veil, so as to hold PennyMac Trust liable for the acts of PennyMac Holdings. Because plaintiff has not alleged any facts as to PennyMac Trust to support a claim of fraud, and has not shown that piercing the veil is necessary to enforce a paramount equity, I am persuaded that, as to PennyMac Trust, the Complaint must be dismissed, with leave to amend.

II.   Whether plaintiff states a claim against PennyMac Holdings under the FDCPA for violations of the MCALA[13]

The MCALA requires that "a person [] have a license whenever the person does business as a collection agency in the State." B.R. § 7-301(a). "Collection agency" includes, in relevant part, a "debt purchaser," who is "a person who engages directly or indirectly in the business of . . . collecting a consumer claim the person owns, if the claim was in default when the person

---

[13] Having determined that the Complaint does not support a claim against PennyMac Trust based on the alleged conduct of PennyMac Holdings, I will analyze the viability of plaintiff's claims solely as to PennyMac Holdings.

acquired it." *Id.* § 7-101(c)(1) (the "debt purchaser provision").  In turn, "consumer claim" is defined as "a claim that: (1) is for money owed or said to be owed by a resident of the State; and (2) arises from a transaction in which, for a family, household, or personal purpose, the resident sought or got credit, money, personal property, real property, or services." *Id.* § 7-101(e).  The FDCPA prohibits a debt collector from, *inter alia*, making a "threat to take any action that cannot legally be taken," 15 U.S.C. § 1692e(5), or "us[ing] unfair or unconscionable means to collect or attempt to collect any debt." *Id.* § 1692f.

Violations of a state collection licensing law such as the MCALA may support a claim under the FDCPA.  *See, e.g.*, *Bradshaw v. Hilco Receivables, LLC*, 765 F. Supp. 2d 719, 726-27 (D. Md. 2011) (Bennett, J.) (holding that a violation of the MCALA may support a cause of action under the FDCPA, including when an unlicensed debt purchaser files lawsuits to collect on debt in default, as a threat to take an action that cannot legally be taken); *Hauk*, 749 F. Supp. 2d at 366-67 (Blake, J.) (indicating that a debt collector's failure to register under state collection law is pertinent to whether it used unfair or unconscionable means to collect a debt); *see also LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1200 (11th Cir. 2010) (holding that defendant's "lack of registration with the State of Florida is an appropriate consideration in deciding whether [defendant's] 'means' of collection were 'unfair or unconscionable'").

However, doing business in violation of the state licensing requirement does not constitute a "per se" violation of the FDPCA.  *See, e.g.*, *Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098, 1100-01 (9th Cir. 1996); *Bradshaw*, 765 F. Supp. 2d at 728-29.  Rather, "the conduct or communication at issue must also violate the relevant provision of the FDCPA." *LeBlanc*, 601 F.3d at 1192 n.13.  For example, the Eighth Circuit observed in *Carlson v. First Revenue Assurance*, 359 F.3d 1015, 1018 (8th Cir. 2004):

The FDCPA was designed to provide basic, overarching rules for debt collection activities; it was not meant to convert every violation of a state debt collection law into a federal violation. Only those collection activities that use "any false, deceptive, or misleading representation or means," including "[t]he threat to take any action that cannot legally be taken" under state law, will also constitute FDCPA violations.

Accordingly, to state a claim for relief under the FDPCA, plaintiff must allege that (1) defendants violated the MCALA by failing to obtain the requisite collection license, and (2) in violating the MCALA, defendants engaged in conduct that also violated the FDPCA.

a.   The Maryland Collection Agency Licensing Act

The cornerstone of plaintiff's FDCPA claim is the allegation that defendants engaged in debt collection activity without the State license required by B.R. § 7-301(a).  According to plaintiff, PennyMac Holdings engaged directly in collecting consumer claims through its foreclosure practices, and indirectly in collecting consumer claims through PennyMac Services. The claim must fail if PennyMac Holdings did not violate the MCALA by doing business as an unlicensed collection agency, in contravention of the MCALA.

Defendants offer three legal arguments to demonstrate that PennyMac Holdings did not violate the MCALA by operating as a debt collection agency without the required license. Defendants contend that, according to legislative intent, PennyMac Holdings falls outside the scope of the MCALA's debt purchaser provision; that a collection agency does not violate the MCALA when, as here, it acts to protect an interest in real property; and, to the extent that PennyMac Holdings acted as a collection agency through PennyMac Services, defendants maintain that collection activities undertaken by PennyMac Services were not unlawful because it held a mortgage lending license, thereby exempting it from the MCALA's licensing requirements.

With respect to "debt purchasers," the MCALA expressly embraces both direct and indirect collection of a "consumer claim" owned by the defendant and purchased when it was in default.  B.R. § 7-101(c)(1).  In *Bradshaw*, 765 F. Supp. 2d at 726, the court said:  "MCALA is clear on its face—it requires that any person who directly or indirectly engages in collecting debts must be licensed."  Courts in this District have had occasion to consider the MCALA in several cases.

In *Bradshaw*, the defendant purchased debts from creditors when the debtors were in default, and pursued litigation in Maryland against the debtors to collect on those debts.  The court found that the defendant qualified as a "collection agency" by pursuing litigation to collect the debts, and therefore violated the MCALA by failing to obtain a license.  *Id*. at 726-27; *see also Hauk*, 749 F. Supp. 2d at 366-67 (treating defendant as a "collection agency" because it purchased consumer debts in default, and filed lawsuits in Maryland to collect on those debts).  In *Winemiller*, *supra*, 2011 WL 1457749 at *1, the defendants were "businesses that purchase[d] consumer debts from other creditors at a substantial discount and then attempt[ed] to collect on that debt, either directly or through intermediaries," including through "the filing of lawsuits in Maryland state court."  The defendants argued that the MCALA did not apply to their conduct because they "placed the purchased debts with a licensed collection agency to collect or file suit on their behalf."  *Id.* at *4.  The court rejected this argument, concluding: "Plaintiffs may still be able to hold Defendants liable even if they hired a third-party to pursue the debt collection claims."  *Id.* at *5.  The court also noted that the "MCALA does not distinguish between collection agencies that use different mechanisms to collect debt."  *Id.* at *4.  Rather, "[i]t targets all persons and entities that do business as collection agencies."  *Id.*

In this case, defendants posit that PennyMac Holdings "does not purchase mortgages for the purpose of immediately commencing non-judicial foreclosure proceedings and did not institute civil litigation against Plaintiff or engage in the collection of their own consumer claims," in contrast to the debt purchasers in *Bradshaw*, *Hauk,* and *Winemiller*.   Memo at 12. This assertion exemplifies the defendants' presentation of their version of the facts, which are not pertinent in the consideration of a motion to dismiss.   And, the facts alleged in the Complaint, which are pertinent, state otherwise.

The Complaint clearly avers that, through foreclosure activity, PennyMac Holdings directly collects on mortgage debts that it purchases in default.   In particular, plaintiff asserts: "PennyMac [Holdings] . . . acquires consumer, mortgage debts in default for pennies on the dollar and then proceeds to try to collect the debt by . . . filing foreclosure actions in Maryland courts."  Compl. ¶ 2.  Further, the Complaint alleges that the mortgages that PennyMac Holdings purchases are in default or foreclosure status at the time they are purchased, *id.* ¶ 13, and that, "in more than 50 occurrences in the State of Maryland in the last year," PennyMac Holdings sought to "collect debts against Maryland consumers through foreclosure, collection actions filed in Maryland state courts and Maryland land records as well as claims reported to the U.S. Bankruptcy Court for Maryland."  *Id.* ¶ 18.  In my view, these allegations meet the definition of a debt purchaser under the MCALA; the Complaint satisfies the pleading requirements for a claim that PennyMac Holdings engaged in the business of purchasing mortgages in default to collect on debts through litigation or other means.

Defendants also insist that PennyMac Holdings did not engage in debt collection with respect to mortgage foreclosure activity because it was acting to protect an interest in real

property, and thus its conduct does not fall within the purview of the MCALA.  *See* Memo at 15-18.  With respect to this contention, defendants rely solely on cases addressing the FDCPA.

I am not aware of any Maryland case law concluding that activity undertaken to protect an interest in real property does not qualify as collection activity under the MCALA.  However, consideration of the FDCPA is helpful in construing the MCALA.  As defendants observe, "the legislative history of the 2007 amendments of the MCALA reveals the Maryland legislature's consideration of the FDCPA's inclusion of debt purchaser's within its scope."  Memo at 15 n.9; *see* H.B. 1324, 2007 Leg. Sess., Econ. Matters Comm. Floor Rep., at 3 (Md. 2007) ("Creditors have taken to selling defaulted receivables at a discount to collectors who are not licensed under Maryland law, although they are subject to the federal Fair Debt Collection Practices Act.").

Notably, the definition of "consumer claim" under the MCALA mirrors that of "debt" under the FDCPA.  As noted, the MCALA defines a "consumer claim" as "a claim that: (1) is for money owed or said to be owed by a resident of the State; and (2) arises from a transaction in which, for a family, household, or personal purpose, the resident sought or got credit, money, personal property, real property, or services."  B.R. § 7-101(e).  In the FDCPA, "debt" is defined as "'any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).

Recently, in *Glazer v. Chase Home Finance LLC*, 704 F.3d 453, 460 (6th Cir. 2013), the Sixth Circuit observed that "confusion has arisen on the question [of] whether mortgage foreclosure is debt collection under the [FDCPA]."  As the *Glazer* Court explained, those courts holding that mortgage foreclosure is *not* debt collection have adopted the view "that the enforcement of a security interest, which is precisely what mortgage foreclosure is, is not debt

collection." *Id.*; *see, e.g.*, *Warren v. Countrywide Home Loans, Inc.*, 342 F. App'x 458, 460-61 (11th Cir. 2012) (per curiam) (collecting cases holding that "an enforcer of a security interest, such as a [mortgage company] foreclosing on mortgages of real property . . . falls outside the ambit of the FDCPA except for the provisions of section 1692f(6)") (quotations omitted).  The *Glazer* Court disagreed with that perspective, however, and concluded that mortgage foreclosure qualifies as debt collection under the FDCPA.  It reasoned that "whether an obligation is a 'debt' depends not on whether the obligation is secured, but rather upon the purpose for which it was incurred." *Glazer*, 704 F.3d at 461.

In other words, a home loan is considered a "debt" so long as it meets the definition of "debt" under the FDCPA: "'any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes[.]'" *Id.* at 460-61 (quoting 15 U.S.C. § 1692a(5)).  And, as the Sixth Circuit observed, mortgage foreclosure is, at its root, simply a particular method to satisfy a debt—by acquiring the property and selling it.  *See id.* at 461 (citing *Shapiro & Meinhold v. Zartman*, 823 P.2d 120, 124 (Colo. 1992)).

Although the Fourth Circuit has not directly addressed the question of whether a defendant's foreclosure practice constitutes debt collection when it pertains to a mortgage that the defendant holds, I find support for the Sixth Circuit's position in the Fourth Circuit case of *Wilson v. Draper & Goldberg*, 443 F.3d 373, 378-79 (4th Cir. 2006), cited by *Glazer*.  *See* 704 F.3d at 462.  In *Wilson*, an attorney was subject to the FDCPA as a debt collector for foreclosing on a property, pursuant to a deed of trust.  *See* 443 F.3d at 378-79.  Of import here, the defendant in *Wilson* was not excluded from the FDCPA's definition of debt collector merely because he

- 28 -

was seeking to "enforce a security interest" on real property through a foreclosure proceeding. *Id.* Rather, the Court said that, "if Defendants meet the statutory definition of 'debt collector,' they can be covered by all sections of the Act, . . . regardless of whether they also enforce security interests." *Id.* at 378; *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 130 S. Ct. 1605, 1609-11 (2010) (holding that attorney pursuing mortgage foreclosure on behalf of mortgagor was subject to FDCPA as a debt collector); *Piper v. Portnoff Law Assocs., Ltd.*, 396 F.3d 227, 234 (3d Cir. 2005) (concluding that pre-suit calls and demand letters for payment on debt secured by lien on home did not "change its character as a debt or turn [the] communications into something other than an effort to collect that debt").

As I see it, the Sixth Circuit correctly concluded that "mortgage foreclosure is debt collection under the FDCPA." *Glazer*, 704 F.3d at 464. Accordingly, I am persuaded that, even if actions pertinent to mortgage foreclosure are taken in connection with enforcement of a security interest in real property, such actions may constitute debt collection activity under the MCALA. Therefore, based on the facts alleged by plaintiff, PennyMac Holdings may qualify as a collection agency under the MCALA with respect to mortgage debt it seeks to collect, including through judicial foreclosure proceedings or other conduct pertinent to foreclosure.

I am equally persuaded that plaintiff sufficiently alleges that PennyMac Holdings operates as a "passive" purchaser of debts in default, by virtue of its indirect collection activity, *i.e.*, collection of mortgage debts through servicing by PennyMac Services and Citi. As *Bradshaw*, *Hauk*, and *Winemiller* make clear, a "passive" debt purchaser qualifies as a collection agency by pursuing collection activities, even through a third party, such as an attorney. *See Bradshaw*, 765 F. Supp. 2d at 726-27; *Hauk*, 749 F. Supp. 2d at 366-67; *Winemiller*, 2011 WL 1457749 at *4. Furthermore, as Judge Bennett noted in *Winemiller*, the "MCALA does not

distinguish between collection agencies that use different mechanisms to collect debt." *Id.* Instead, "[i]t targets all persons and entities that do business as collection agencies." *Id.*

In addition, defendants vigorously argue that the conduct of PennyMac Holdings is not within the intended scope of the debt purchaser amendment.  The debt purchaser provision specifically targeted entities that, by virtue of a statutory loophole in the MCALA, "enter[ed] into purchase agreements to collect delinquent consumer debt rather than acting as an agent for the original creditor," and then "collect[ed] consumer debt in the State without complying with any licensing or bonding requirement." *Bradshaw*, 765 F. Supp. 2d at 726 (quoting H.B. 1324, 2007 Leg. Sess., S. Fin. Comm. (Md. 2007)).  To close that loophole, the MCALA now requires licensing of entities that "'purchase delinquent consumer debt'" and then "'collect from consumers like other collection agencies who act on behalf of original creditors.'" *Bradshaw*, 765 F. Supp. 2d at 726 (quoting H.B. 1324, 2007 Leg. Sess., S. Fin. Comm. (Md. 2007)).  The "debt purchasers" provision was implemented to "'extend[] the purview of the [Maryland] State Collection Licensing Board to include persons who collect consumer claims acquired when claims were in default.'" *Bradshaw*, 765 F. Supp. 2d at 726 (quoting H.B. 1324, 2007 Leg. Sess., S. Fin. Comm. (Md. 2007)).

As defendants observe, the legislative history indicates that the General Assembly expected the amendment to expand the MCALA to cover an additional 40 "maverick collectors" that had previously taken advantage of the loophole to engage in unlicensed collection activities. *See* Memo at 13-14.  But, statutory interpretation begins with the statutory text.   *Johnson v. Mayor & City Council of Balt.*, ____ Md. ____, ___ A.3d ____, 2013 WL 656613, at *3 (Feb. 25, 2013); *see also Morgan v. Sebelius*, 694 F.3d 535, 537 (4th Cir. 2012).   And, when interpreting a statute, a court should "'give the terms their ordinary, contemporary, common

meaning, absent an indication [that the legislature] intended [the terms] to bear some different import.'" *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (quoting *Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011)). "[I]f the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, [the court's] inquiry is at an end." *Johnson*, 2013 WL 656613 at *3. Only if the statutory language is ambiguous is it appropriate to look to legislative history. *Johnson v. Zimmer*, 686 F.3d 224, 235 (4th Cir. 2012).

The plain language of the MCALA is not ambiguous, and it embraces the conduct in which PennyMac Holdings allegedly engaged. *Bradshaw*, 765 F. Supp. 2d at 726 ("MCALA is clear on its face . . . ."). Plaintiff has adequately alleged that PennyMac Holdings "does business as a collection agency," both when it engages in mortgage foreclosure activity and when it retains third parties to service debt it purchases in default. Therefore, she contends that it must comply with the MCALA's licensing requirement. *See* B.R. § 7-301(a).[14]

### b. The Fair Debt Collection Practices Act

As noted, unlicensed collection activity in violation of a state licensing law, such as the MCALA, may support a claim under the FDCPA, but it does not constitute a per se violation of the federal statute. *See, e.g.*, *Bradshaw*, 765 F. Supp. 2d at 728-29. To allege a claim under the FDCPA, the purported violation of a state licensing law must violate the relevant FDCPA provision. *See, e.g.*, *Wade*, 87 F.3d at 1100-01; *LeBlanc*, 601 F.3d at 1192 n.13; *Bradshaw*, 765 F. Supp. 2d at 729. To state successfully a claim under the FDCPA, the complaint must allege

---

[14] Having concluded that the allegations are sufficient to establish that PennyMac Holdings qualifies as a debt purchaser, I need not address defendants' argument that the mortgage lender license held by PennyMac Services satisfied PennyMac Holdings' licensing obligation under the MCALA with respect to its alleged indirect collection activities. Moreover, I decline to address defendants' suggestion that Maryland's foreclosure process is "non-judicial."

that the defendant is a "debt collector"; that plaintiff is "the object of collection activity arising from consumer debt"; and that, in connection with plaintiff's debt, the defendant engaged in debt collection activity prohibited by the FDCPA. *Steward v. Bierman*, 859 F. Supp. 2d 754, 759 (D. Md. 2012).

Plaintiff has identified two specific FDCPA provisions as the basis for her claims: 15 U.S.C. § 1692e(5), which provides that a debt collector may not "threat[en] to take any action that cannot legally be taken," and 15 U.S.C. § 1692f, which provides that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt."[15] Defendants do not contest that plaintiff is a consumer with respect to the mortgage debt at issue. But, they insist that the claims fail for two reasons: PennyMac Holdings is not a debt collector under the FDCPA, and PennyMac Holdings did not engage in any debt collection activity that is prohibited by the FDCPA.

### i. *"Debt collector" under the FDCPA*

The FDCPA is intended to protect consumers from debt collectors who engage in abusive and deceptive debt collection practices. 15 U.S.C. § 1692; *see United States v. Nat'l Fin. Servs. Inc.*, 98 F.3d 131, 135 (4th Cir. 1996). To fall within the purview of the FDPCA, a defendant must qualify as a "debt collector," defined, in part, as a person who "regularly collect[s] or attempt[s] to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Defendants contend that the Complaint fails to state a claim as to the FDCPA because defendants do not qualify as debt collectors under federal law.

---

[15] Plaintiff alleges that defendants' conduct violated "various provisions" of the FDCPA. Compl. ¶ 70. However, because plaintiff does not specifically identify these provisions, I have no basis to evaluate plaintiff's claims with respect to any violation, other than 15 U.S.C. § 1692e(5) and 15 U.S.C. § 1692f.

Defendants insist that they are not debt collectors under the FDCPA because they qualify as "creditors," *see* Memo at 19, and creditors and debt collectors are distinct and "mutually exclusive" categories under the FDCPA. *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003). In short, a defendant who is a creditor is not a debt collector with respect to a particular debt.

A "creditor" is broadly defined in the FDCPA as "any person who offers or extends credit creating a debt or to whom a debt is owed," 15 U.S.C. § 1692a(4), and the FDCPA does not apply to any person collecting on a debt that it "originated." *Id.* § 1692a(6)(F)(ii). The FDCPA exempts creditors from liability because, unlike debt collectors, they "generally are restrained by the desire to protect their good will when collecting past due accounts." S. Rep. No. 95-382, at 2 (1977), *reprinted in* U.S.C.C.A.N. 1695, 1696. In contrast, debt collectors might lack such self-restraint because they would have "no future contact with the consumer and often are unconcerned with the consumer's opinion of them." *Id.*

This logic extends to the debt purchaser context. The creditor exception does not include "any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." 15 U.S.C. § 1692a(4). Interpreting this provision, the Seventh Circuit explained in *Schlosser*, 323 F.3d at 538:

> If the loan is current when it is acquired, the relationship between the assignee and the debtor is, for purposes of regulating communications and collection practices, effectively the same as that between the originator and the debtor. If the loan is in default, no ongoing relationship is likely and the only activity will be collection.

Accordingly, courts have concluded that the assignee or transferee of a debt in default is a debt collector where it purchases the debt "solely for the purpose of collection." *See, e.g.*, *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 502 (7th Cir. 2008) (reiterating Seventh

Circuit holding that "an agency in the business of acquiring and collecting on defaulted debts originated by another is a debt collector under the FDCPA even though it actually may be collecting for itself"); *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 404 (3d Cir. 2000) (concluding that defendant was a debt collector because the principal purpose of its business was the "'collection of any debts,' namely, defaulted obligations which it purchases from municipalities").

As defendants point out, some courts have held that, where the debt purchaser seeks to collect the debt for itself, and not "for another," the debt purchaser remains a creditor even with respect to debts it purchased when they were in default. *See, e.g.*, *Schlegel v. Wells Fargo Bank, N.A.*, 799 F. Supp. 2d 1100, 1104-05 (N.D. Cal. 2011). These courts have reasoned that the words "of another" would otherwise be written out of the statutory text. *See id.* The *Schlegel* Court determined that it is appropriate to disregard the "of another" language only where "an artificial distinction between 'creditor' and 'debt collector' as a result of the 'for another' language would unfairly allow a debt collector to masquerade as a creditor." *Id.* at 1105. In its view, even though the defendant had purchased the debt at issue in default, "defendant offered [p]laintiffs a loan modification, [thereby] making its activity more debt servicing than debt collection." *Id.* Reasoning that defendant's debt servicing involved an ongoing relationship, the court concluded that the defendant's conduct fell within the purpose of the creditor exception. *See id.*

Defendants maintain that the options offered by PennyMac Holdings to debtors in default, such as the Making Home Affordable Loan Modification program, sets PennyMac Holdings apart from debt purchasers that immediately seek to foreclose. *See* Memo at 21. Further, they assert that PennyMac Holdings does not "masquerade as a creditor." Thus, they

ask this Court not to disregard the "for another" language.  *See* Reply at 12-13.  Conversely, plaintiff claims that, even though PennyMac Holdings is the secured party in this case, it is excluded from the definition of a creditor because it purchases debts in default "solely for the purposes of facilitating collection" of such debt, under 15 U.S.C. § 1692a(4).  *See* Opp. at 26-32.

Clearly, a fact-intensive inquiry is necessary to determine whether plaintiff is correct that defendants purchase debts in default "solely" for collection, or whether, as defendants contend, they do not purchase debts in default "solely" for the purpose of collection, but rather for servicing.  Such an inquiry is not appropriate for resolution by way of a motion to dismiss.  For the same reason, I cannot determine whether strictly applying the "for another" language would "unfairly allow a debt collector to masquerade as a creditor."  *Schlegel*, 799 F. Supp. 2d at 1105.  Therefore, I decline to dismiss the claim on the ground that PennyMac Holdings is a creditor, as opposed to a debt collector.

Defendants also contend that, even if PennyMac Holdings cannot be characterized as a creditor, the Complaint nonetheless fails to allege facts affirmatively showing that PennyMac Holdings is a debt collector, because it does not "regularly collect[] or attempt to collect[], directly or indirectly, [consumer] debts."  15 U.S.C. § 1692a(6).  I disagree, for the reasons supporting my earlier resolution of the issue concerning conduct pertinent to a foreclosure proceeding under the MCALA.  *See Glazer*, 704 F.3d at 460-62.  As I explained, the Complaint adequately alleges that PennyMac Holdings regularly and directly engages in collection activities with respect to mortgages in default.  Such conduct amounts to that of a debt collector.[16]

---

[16] Having determined that the allegations are sufficient to establish that PennyMac Holdings is a debt collector based on direct conduct, I need not address defendants' alternative argument that PennyMac Holdings is not a debt collector based on its indirect collection activities.  *See* Memo at 22-23.

ii.      *Activity prohibited by 15 U.S.C. §§ 1692e(5) & 1692f of the FDCPA*

Although I have determined that plaintiff has adequately alleged that PennyMac Holdings is a debt collector, I must also be satisfied that plaintiff has alleged a violation of a specific FDCPA provision with respect to plaintiff's particular debt.  As a matter of Article III standing, Ademiluyi's claims cannot rest on PennyMac Holdings' general business practices, even if some of those practices violate the FDCPA.  "[T]hat a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotations omitted); *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (holding that named class-action plaintiff "must allege a distinct and palpable injury to [her]self, even if it is an injury shared by a large class of other possible litigants").  Accordingly, to plead a viable claim, the conduct allegedly taken by PennyMac Holdings in violation of the MCALA must constitute actionable conduct under the FDCPA as to Ademiluyi.

With respect to plaintiff's claims under 15 U.S.C. § 1692e(5), plaintiff alleges that the Notice represented a "threat" by a debt purchaser to foreclose on plaintiff's mortgage, for which, as discussed *supra*, a collection agency license was required by Maryland law.  And, as previously discussed, a debt collector that threatens the kind of legal action for which a State collection license is required may be liable under the FDCPA if it operates without a license.  *See Bradshaw*, 765 F. Supp. 2d at 726-27; *Hauk*, 749 F. Supp. 2d at 366-67; *LeBlanc*, 601 F.3d at 1190 n.9 ("In terms of taking an action that could not legally be taken, the theory is that if a debt collector cannot bring suit for whatever reason, it should not represent to the consumer, even implicitly, that it will sue.").

Among other things, in capital letters the Notice carried the heading "NOTICE OF INTENT TO FORECLOSE," represented that plaintiff was "AT RISK OF LOSING [HER] HOME TO FORECLOSURE," and stated that it was a "notice of intent to foreclose if the default under the Deed of Trust is not resolved." *See* ECF 10-9. Significantly, a FDCPA claim is evaluated under the least sophisticated debtor standard. *See Bradshaw*, 765 F. Supp. 2d at 730-31 (citing *United States v. Nat'l Fin. Servs. Inc.*, 98 F.3d 131, 135-36 (4th Cir. 1996)). This standard "asks whether the least sophisticated debtor would likely be misled or deceived by the communication at issue." *Grant-Fletcher v. Brachfeld Law Group, PC*, WMN-11-2072, 2012 WL 2523094, at *3 (D. Md. June 28, 2012).

Based on the language contained in the Notice and the other allegations, I am persuaded that, under the least sophisticated debtor standard, a fact finder could determine that the Notice would have been understood as a representation by PennyMac Holdings that it intended to initiate foreclosure proceedings against plaintiff. Although defendants contend that the Notice was sent by their loan servicer or a law firm, and not PennyMac Holdings, this raises a factual matter that is not appropriate for consideration in the context of a pre-discovery motion to dismiss.[17]

The Notice is clearly distinguishable from *Grant-Fletcher*, 2012 WL 2523094 at *6, in which an unlicensed debt collector's letter to a consumer regarding an outstanding balance "contain[ed] no reference, either direct or implicit, to suit, lawsuit, legal action, or litigation," and therefore did not support an FDCPA claim. Accordingly, the Notice at issue could constitute a threat to take action, in violation of 15 U.S.C. § 1692e(5). With respect to the alleged direct

---

[17] On several occasions in its Motion, defendants insist that the Notice was sent by defendants' loan servicer or the servicer's attorney, and not by defendants. *See, e.g.*, Memo at 15 & n.8, 17.

collection practices for claims under 15 U.S.C. § 1692f, "a debt collector's failure to register under a state debt collection law 'is an appropriate consideration in deciding whether [its] means of collection were unfair or unconscionable.'" *Hauk*, 749 F. Supp. 2d at 366 (quoting *LeBlanc*, 601 F.3d at 1200). Because PennyMac Holdings engaged in collection activity without a license, it may have used unfair or unconscionable means in connection with collecting plaintiff's debt. *See id.* Indeed, plaintiff alleges that her interactions with PennyMac Holdings were guided by the belief that defendants' conduct was lawful. Thus, plaintiff raises colorable claims under 15 U.S.C. § 1692e(5) and § 1692f in regard to PennyMac Holdings' dissemination of the Notice.

Defendants also insist that the Notice is not actionable because the purpose of the Notice was not to collect on a debt. *See* Memo at 15-17. To this end, defendants observe that the Notice does not make an express demand for payment, but rather "sets forth all of the information required to be disclosed to residential property owners." Reply at 4-5. Whether the Notice itself was sent to collect the debt is not at issue. As noted, 15 U.S.C. § 1692e and § 1692f apply to unfair or deceptive communications "in connection with" the collection of any debt. Thus, even accepting defendants' assertion that the Notice was not sent to collect a debt, the allegations are sufficient to show that it was sent "in connection with" the collection of a debt, which is all that the FDCPA requires. *See, e.g.*, *Wilson*, 443 F.3d at 376 (holding that debt collector's "*actions surrounding* the foreclosure proceeding were attempts to collect a debt") (emphasis added).

Additionally, defendants maintain that they are absolved of any liability under the FDCPA because information contained in the Notice was required under the Truth in Lending Act and issued in accordance with State law requirements set forth in R.P. § 7-105.1. In particular, defendants cite *Moore v. Commonwealth Trustees, LLC*, No. 3:09CV731, 2010 WL

4272984, at *4, (E.D. Va. Oct. 25, 2010), and *Blagogee v. Equity Trustees, LLC*, No. 1:10-CV-13 (GBL-IDD), 2010 WL 2933963, at *6 (E.D. Va. July 26, 2010), for the proposition that a notice sent pursuant to state law does not constitute collection activity.  But, those cases did not involve state collection licensing requirements and, consequently, have little bearing here.  Moreover, state law did not obligate PennyMac Holdings to institute a foreclosure action, let alone institute an action absent a collection license.  Rather, according to the allegations, PennyMac Holdings chose to represent that it would initiate foreclosure proceedings against plaintiff.  Therefore, it was obligated under state and federal law to send a notice prior to initiating a foreclosure action.

In sum, with respect to the Notice of Intent to Foreclose—the direct collection activity alleged in the Complaint—I am persuaded that the Notice could constitute both "a threat to take an action that cannot legally be taken," in violation of 15 U.S.C. § 1692e(5), and "unfair or unconscionable means" of collecting a debt, in violation of 15 U.S.C. § 1692f.

Defendants fare no better in connection with alleged indirect debt collection activities.  Plaintiff concedes that PennyMac Holdings did not directly undertake to service the debt itself, but claims that the FDCPA applies to debt collectors that collect debts both directly and indirectly.  15 U.S.C. § 1692a(6).  Plaintiff's theory of liability under 15 U.S.C. §§ 1692e and 1692f is that PennyMac Holdings engaged in debt collection activity indirectly, through PennyMac Services and Citi as its servicing agents.  *See* Opp. at 24, 28-32.

For the reasons discussed earlier, I agree with plaintiff.  A debt collector is not immunized from liability for collection activities merely because such actions are undertaken indirectly through an agent.  *See, e.g.*, *Bradshaw*, 765 F. Supp. 2d at 719 (holding that debt collector could be liable under FDCPA for collection efforts undertaken by hired attorneys);

*Winemiller*, 2011 WL 1457749 at *3 (holding that plaintiff stated a claim against debt collector for conduct undertaken by subsidiaries as agents).  And, the cases relied upon by defendants in support of the proposition that "this court has routinely distinguished debt owners and debt collectors to whom collection is referred," Memo at 21-22, are distinguishable.  *Baccone v. American Express Co.*, No. RDB 05-3436, 2007 WL 2914909, at *5-6 (D. Md. Oct. 4, 2007) involved allegations against American Express, which plaintiff specifically alleged to be a creditor as opposed to a debt collector.  *Fontell v. Hassett*, 10-cv-01472-AW, 2012 WL 1409390, at *4 (D. Md. Apr. 20, 2012), involved "debt owners" that had purchased the plaintiff's debt from the original creditors before it went into default.  Neither case is analogous to the facts presented here.[18]

Furthermore, defendants acknowledge that PennyMac Services "performs the day-to-day activities of loan administration, processing of payments, providing customer service and workout and loan resolution support for troubled borrowers, implementing modification efforts, notifying borrowers of accounts payable, initiating and monitoring foreclosure efforts, and managing REO sales, among other activities."  Memo at 5.  This concession supports plaintiff's position that PennyMac Services played a significant role in facilitating collection efforts by PennyMac Holdings, as opposed to engaging in wholly separate conduct.  Insofar as PennyMac Holdings violated the FDCPA through the conduct of PennyMac Services, as its agent, then plaintiff's Complaint states a valid claim.  At the motion to dismiss stage, plaintiff's theory is plainly viable.

---

[18] Even assuming that, as a legal proposition, the conduct of another in mailing the Notice would relieve defendants of liability, the facts posited by defendants are not properly before the Court at this juncture.

Finally, I am not convinced that, as defendants argue, PennyMac Services's direct affiliation with PennyMac Holdings distinguishes this case from instances in which a debt collector engaged in debt collection activity through an unaffiliated third party, as in *Bradshaw*. So far as the Court is aware, the text of the FDCPA does not differentiate between a debt collector acting through affiliated and unaffiliated third-party intermediaries. Furthermore, as plaintiff aptly notes, permitting a corporate entity to evade liability for indirect collection activity undertaken through a corporate affiliate would allow corporate entities to circumvent the FDCPA by relying on affiliated entities, as opposed to third parties. Such a result contradicts this Court's obligation to construe broadly the FDCPA to effectuate its remedial purpose. *Glover v. F.D.I.C.*, 698 F.3d 139, 149 (3d Cir. 2012).

In sum, I conclude that it is appropriate to permit plaintiff's FDCPA claims to proceed on both direct and indirect collection theories, under both 15 U.S.C. § 1692e(5) and § 1692f.

III.   Whether plaintiff states a claim for mortgage fraud under the Maryland Mortgage Fraud Protection Act

The MMFPA prohibits "mortgage fraud."   *See* R.P. § 7-402.   Under R.P. § 7.401(d), mortgage fraud includes:

> [A]ny action by a person made with the intent to defraud that involves: (1) Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process; [and] . . . (3) Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process; . . . .

As defined in the statute, the "mortgage lending process" includes "(i) [t]he solicitation, application, origination, negotiation, servicing, underwriting, signing, closing and funding of a mortgage loan; and (ii) the notarizing of any document in connection with a mortgage loan."

- 41 -

R.P. § 7-401(e)(2).   The MMFPA encompasses conduct in connection with a mortgage loan closing, as well as "post-closing servicing activities."  *Stovall v. SunTrust Mortg., Inc.*, Civ. No. RDB-10-2836, 2011 WL 4402680, at *10 (D. Md. Sept. 20, 2011).   Notably, the MMFPA provides a private right of action "for damages incurred as a result of a violation of this subtitle." *Id.* § 7-406.   Thus, where a defendant's allegedly fraudulent conduct occurs in connection with any of the post-closing stages of the "mortgage lending process," it is "clearly contemplated [as actionable] by the Maryland Mortgage Fraud Protection Act."  *Stovall*, 2011 WL 4402680 at *10 n.2 (distinguishing *Benson v. Candor Mortg. Corp.*, No. L-10-481, 2010 WL 1741379 (D. Md. Apr. 27, 2010)).

The MMFPA does not define the terms "misrepresentation" or "omission," as used in the statute  But, under Maryland common law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'"  *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted).   Regardless of the particular theory, the plaintiff must establish the elements of fraud "by clear and convincing evidence."  *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

In an action for fraudulent misrepresentation, the plaintiff ordinarily must show:

1) that the defendant made a false representation to the plaintiff;

2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;

3) that the misrepresentation was made for the purpose of defrauding the plaintiff;

4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and

5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S&R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427

Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted).

Moreover, the "misrepresentation must be made with the deliberate intent to deceive." *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)); *see Fegeas v. Sherrill*, 218 Md. 472, 476-77, 147 A.2d 223, 225-26 (1958) ("'To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive.'") (citation omitted); *accord Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 390 (2008). And, the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

Ordinarily, under Maryland law, a mere failure to disclose a material fact does not constitute fraud, in the absence of a legal duty to disclose that inheres in certain types of transactions; "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party." *Gaynor*, 370 Md. at 97, 803 A.2d at 516. However, "[e]ven in the absence of a duty of disclosure, one who suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud." *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469

U.S. 1215 (1985).

With respect to active suppression or concealment of facts, the Maryland Court of Appeals has said: "Fraudulent Concealment 'is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed.'" *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 138, 916 A.2d 257, 274 (2007). In other words, it describes a "situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from" a material fact. *Id.* at 138 n.11, 916 A.2d at 274 n.11. As the *Rhee* Court explained, 182 Md. App. at 536, 958 A.2d at 396 (internal citation omitted) (alterations in *Rhee*):

> [T]he concealment or suppression [of a material fact] is in effect a representation that what is disclosed is the whole truth. The gist of the action [for fraud] is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant . . . .

Where the fraudulent concealment claim is based on a duty to disclose, Maryland courts have formulated the elements of the cause of actions as follows:

> "(1) [T]he defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

*Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010) (quoting *Lloyd*, 397 Md. at 138, 916 A.2d at 274) (emphasis omitted).

The Maryland Court of Appeals encapsulated the foregoing principles in *Frederick Road Limited Partnership v. Brown & Sturm*, 360 Md. 76, 100 n.14, 756 A.2d 963, 976 n.14 (2000) (internal citations omitted):

> Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure. Absent a fiduciary relationship, this Court has held that a plaintiff

seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known.

The plain text of the MMFPA creates a statutory duty to disclose and a related action for fraud.  As noted, mortgage fraud under R.P. § 7.401(d) includes the making, knowingly and with the "intent to defraud," of an "omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process."  And, the MMFPA provides a private right of action "for damages incurred as a result of a violation of this subtitle."  *Id.* § 7-406.  Therefore, under the MMFPA, PennyMac Holdings had a duty to disclose to its debtor material information with respect to the mortgage lending process.

Nonetheless, defendants have moved to dismiss plaintiff's claims for mortgage fraud under the MMFPA on the ground that plaintiff has failed to plead her claim "with particularity," as required by Fed. R. Civ. P. 9.  *See, e.g.*, *Zervos v. Ocwen Loan Servicing*, No. 1:11-cv-03757-JKB, 2012 WL 1107689, at *5 (D. Md. Mar. 29, 2012) ("Plaintiffs fail to state a claim under the [M]MFPA, however, because they have failed to meet the heightened pleading standards of Fed. R. Civ. P. 9(b) with respect to the details of the alleged fraudulent representations and because they have alleged no facts evincing that Defendant had knowledge of the statements' falsity or intent to defraud.").  In particular, defendants contend that plaintiff has failed to identify, with precision, "the date, place, and time or circumstances of active misstatements, misrepresentations, and omissions alleged, specifying which entity or entities are supposedly responsible for those statements, representations or omissions."  Memo at 23-24.  Additionally,

defendants argue that plaintiff's Complaint fails to satisfy several elements of a mortgage fraud claim, including actual damages from plaintiff's reliance on any fraudulent conduct, and defendants' intent to defraud. *See id.*

To be sure, the allegations of fraud implicate the heightened pleading standard under Fed. R. Civ. P. 9(b). The rule states: "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted); *see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

As the Fourth Circuit has said, Fed. R. Civ. P. 9(b) serves several salutary purposes:

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation."

*Harrison*, 176 F.3d at 784 (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990)).

By its terms, however, Rule 9(b) permits a general averment of aspects of fraud that relate to a defendant's state of mind. Rule 9(b) is "less strictly applied with respect to claims of

fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, Civ. No. HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)); *accord Gadson v. Supershuttle Int'l*, Civ. No. AW-10-1057, 2011 WL 1231311, at * 9 (D. Md. Mar. 30, 2011).  Thus, "[i]n cases involving concealment or omissions of material facts, . . . meeting Rule 9(b)'s particularity requirement will likely take a different form."  *Piotrowski v. Wells Fargo Bank, N.A.*, Civ. No. DKC 11-3758, 2013 WL 247549 (D. Md. Jan. 22, 2013) (citing *Shaw*, 973 F. Supp. at 552).  And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Harrison*, 176 F.3d at 784.

The factual premise of plaintiff's MMFPA claim essentially duplicates her claims under the FDCPA.  Plaintiff urges that, despite PennyMac Holdings' repeated communications with plaintiff, both directly and through its purported servicing agents, PennyMac Holdings violated its duty to disclose that it lacked the license required to operate in Maryland as a collection agency.

Materiality raises a factual issue.  *See, e.g.*, *Dunn v. Borta*, 369 F.3d 421, 427 (4th Cir. 2004) ("'[I]n general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss.  Thus, we review the complaint only to determine that it pleads the existence of such statements and presents a plausible jury question of materiality.'") (quoting *In re Cabletron Sys. Inc. Secs. Litig.*,

311 F.3d 11, 34 (1st Cir. 2002)).  And, in Maryland, a defendant's "lack of proper licensing" can be material to a plaintiff who, when interacting with the defendant, is guided by the presumption that the defendant is licensed and therefore engaged in lawful conduct.  *Cf. Golt v. Phillips,* 308 Md. 1, 9-10, 517 A.2d 328, 332 (1986) (holding that plaintiff stated a claim for unfair or deceptive trade practices under Maryland's Consumer Protection Act ("CPA"), an element of which is materiality, based on landlord's unlicensed rental of an apartment, because "[i]mplicit in any advertisement and rental of an apartment is the representation that the leasing of the apartment is lawful" and "the lack of proper licensing for an apartment under most circumstances is a material fact that any tenant would find important in his determination of whether to sign a lease agreement and move into the premises").

The Complaint indicates that plaintiff "reasonably relied" on alleged misrepresentations or omissions by defendants that they could lawfully pursue foreclosure and collection activities in the State, *see* Compl. ¶¶ 50, 83, thereby suffering damages in the form of "sums collected directly and indirectly by PennyMac to which it had no legal right to collect."  Opp. at 37 (citing Compl. ¶ 49).  Further, plaintiff avers that, in reliance on PennyMac Holdings' seemingly lawful conduct, she incurred expenses in the form of attorney's fees to contest its collection efforts, and suffered emotional distress as a direct result of the collection activities.  *See* Compl. ¶ 49.  Put another way, plaintiff claims that, if PennyMac Holdings had disclosed that it lacked a State of Maryland collection agency license, and was not in compliance with Maryland collection laws, she would not have suffered such harm.

In my view, plaintiff has adequately stated a claim for mortgage fraud under Rule 9(b).  The Complaint's factual allegations are sufficient to provide notice to defendants of the basis of plaintiff's claims.  *Cf. Piotrowski*, 2013 WL 247549 at *12-14 ("[T]he substance of the alleged

omissions is clear: despite repeatedly communicating with Mr. Piotrowski, Wells Fargo failed to disclose that it was not actually considering Mr. Piotrowski's requests but had instead summarily ignored them.   This is sufficient to meet the relaxed Rule 9(b) standard as it provides Wells Fargo with notice for the basis of Mr. Piotrowski's []CPA claim" and "an MMFPA claim based on the same conduct").

However, I agree with defendants that plaintiff is not entitled to restitutionary damages for payments made pursuant to her mortgage. *See* Memo at 26-27. To be sure, the MMFPA allows an action for "damages incurred as a result of a violation of this subtitle." *Id.* § 7-406. But, plaintiff is not entitled to recover as damages the monies she owed under the mortgage, merely because PennyMac Holdings violated a Maryland licensing statute.

Critically, the MCALA does not limit the holder of a mortgage, such as PennyMac Holdings, from receiving payments that are legally due under a mortgage contract.   In other words, that PennyMac Holdings did not possess a Maryland collection agency does not vitiate plaintiff's contractual obligation to pay her mortgage debt; it merely circumscribes the conduct in which PennyMac Holdings may lawfully engage in the event of plaintiff's default.   And, plaintiff cannot assert that, in paying an obligation that she was contractually bound to pay, she relied on defendant's alleged failure to disclose that it lacked a license.   To conclude otherwise would result in a financial windfall to plaintiff that does not appear to be contemplated by the statute.   *Cf. CitaraManis v. Halowell*, 328 Md. 142, 152, 613 A.2d 964, 696 (1992) (distinguishing between public enforcement remedies available under the CPA for which actual harm is not required, and private remedies, which "requires an aggrieved consumer to establish the nature of the actual injury or loss that he or she has allegedly sustained as a result of the prohibited practice").

- 49 -

In this regard, it is noteworthy that, in her suit, plaintiff did not include a claim for recission.  *See, e.g.*, *Holmes v. Coverall N. Am., Inc.*, 98 Md. App. 519, 529, 633 A.2d 932, 936 (1993) ("Grounds in equity or law for revocation of a contract include an allegation that the contract is void for lack of mutual consent, consideration or capacity or voidable for fraud, duress, lack of capacity, mistake, or violation of a public purpose.") (quotation omitted); *cf. Adam v. Wells Fargo Bank, N.A.*, Civ. No. ELH-09-2387, 2011 WL 3841547, at *11-16 (D. Md. Aug. 26, 2011) (discussing consequential damages in breach of contract action arising out of residential mortgage dispute).   Nevertheless, as discussed *infra*, plaintiff may proceed with respect to other damages allegedly flowing from plaintiff's reliance on PennyMac Holdings' omissions, such as expenses incurred in attempting to resolve alleged collection efforts after her mortgage default and emotional distress suffered during that time.  *See* Compl. ¶ 49.

Accordingly, the Motion to Dismiss as to Count III will be granted with respect to plaintiff's claims for recovery of her mortgage payments, but otherwise denied.

IV.   Unjust Enrichment

In Count IV, plaintiff asserts a claim for unjust enrichment, on the ground that defendants "are not and were not entitled to receive any benefit or payments from Plaintiff and Class Members as a result of the collection actions they pursued directly and indirectly against the Plaintiff[] and Class Members."  Compl. ¶ 86.  However, where an express contract governs the relationship between the parties, a claim for unjust enrichment is not viable.  *See Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 92-101, 747 A.2d 600, 605--10 (2000) (explaining that, "generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted where an express contract . . . exists").  "Unjust enrichment and quantum meruit, both 'quasi-contract' causes of action, are remedies to provide relief for a

plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided." *Dunnaville v. McCormick & Co.*, 21 F. Supp. 2d 527, 535 (D. Md. 1998).

In this case, the Note and the Deed of Trust are contracts, and they governed the relationship between the parties: plaintiff as borrower and PennyMac Holdings as creditor. Plaintiff has not alleged that the Note or Deed of Trust is void in any regard. Rather, she contends that her unjust enrichment claim should be allowed to proceed because the terms of the contract may be disputed. *See, e.g.*, *VCA Cenvet, Inc. v. Chadwell Animal Hosp., LLC*, Civ. JKB-11-1763, 2011 WL 6257190, at *4 (D. Md. Nov. 29, 2011) (recognizing that a claim for unjust enrichment may be permitted as an alternative to breach of contract where the contract terms are disputed). However, the Complaint fails to identify any provisions that are disputed, particularly as would pertain to plaintiff's contractual payment obligations. Moreover, as discussed, *supra*, plaintiff is not absolved of her obligation to pay her mortgage as a consequence of PennyMac Holdings' failure to obtain a collection license, such that a claim for unjust enrichment would be available.

Again, *CitaraManis*, 328 Md. 142, 613 A.2d 964, is instructive. In that case, plaintiffs argued that because their landlord did not hold a rental housing license they were "entitled [under the CPA] to obtain restitution of the rent they paid during their occupancy of the demised premises because the rent was paid pursuant to an illegal and unenforceable lease." *Id.* at 158, 613 A.2d at 971. The Maryland Court of Appeals rejected this argument, reasoning that "the absence of a rental housing license in and of itself does not establish the right to recover rent paid." *Id.* at 164, 613 A.2d at 974. Although the Court did not decide whether the landlord's failure to obtain the license would bar the landlord's claim for rent under the lease, it concluded

that the contract was not void, and restitution was not required despite the licensing violation. *See id*. The court reasoned that because "the tenants ha[d] received everything that they bargained for, [] a necessary element justifying the remedy of restitution, *i.e.*, unjust enrichment, is lacking." *Id.* at 159, 613 A.2d at 972.

Similarly, there is no basis here from which to infer that the lack of a collection agency license entitles plaintiff to restitution of mortage payments made under a legally enforceable contract. Accordingly, I will dismiss plaintiff's claim for unjust enrichment.

V.      Remedies disputed by Defendants

Plaintiff has requested a variety of remedies in the Complaint, including actual damages, damages for emotional distress, attorney's fees, and disgorgement of monthly mortgage payments. Defendants dispute the availability of several of these items of damages.[19]

First, relying on case law governing claims for intentional infliction of emotional distress, defendants contend that plaintiff is not entitled to damages for emotional distress.[20] Defendants' position is incorrect. Courts have found that damages for emotional distress are available as actual damages under the FDCPA. *See, e.g.*, *McCullough v. Johnson, Rodenburgh*

---

[19] Having granted the Motion to Dismiss with respect to restitution in connection with the mortgage fraud claim, as well as the unjust enrichment claim, I will address defendants' arguments as to damages only insofar as they are available with respect to Count II, plaintiff's claims under the FDCPA, as set forth in paragraph 74 of the Complaint, and her remaining claim for damages under Count III.

[20] In Maryland, the tort of intentional infliction of emotional distress consists of four elements: "'(1) The conduct must be intentional and reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe.'" *Caldor, Inc. v. Bowden*, 330 Md. 632, 641-42, 625 A.2d 959, 963 (1993) (citation omitted). "Indeed, '[t]o be actionable, the conduct relied upon must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 758 (D. Md. 2011) (quoting *Farasat v. Poulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997)). The Maryland Court of Appeals has said that this "tort is to be used sparingly and only for opprobrius behavior that includes truly outrageous conduct." *Ky. Fried Chicken Nat'l Mgmt. v. Weathersby*, 326 Md. 663, 670, 607 A.2d 8, 11 (1992).

& *Lauinger, LLC*, 637 F.3d 939, 957-58 (9th Cir. 2011) (upholding jury award of damages for emotional distress under FDCPA). Damages awarded under the FDCPA for emotional distress may be slight, but they are nonetheless viable. *See, e.g.*, *Ford v. Consigned Debts & Collections, Inc.*, Civ. No. 09-3102 (NLH) (AMD), 2010 WL 5392643, at *5 (D.N.J. Dec. 21, 2010) (collecting cases and stating that "awards for actual damages are minimal for emotional distress absent any indication that mental health treatment has been obtained or that the emotional distress has concretely affected a plaintiff's personal or professional life").

Defendants also contend that plaintiff may not recover damages for attorney's fees associated with her attempt to work out a loan modification agreement.[21] Maryland follows the "American Rule" for recovery of attorney's fees as an element of damages, under which recovery is available when "the wrongful conduct of a defendant forces a plaintiff into litigation with a third party." *Thomas v. Gladstone*, 386 Md. 693, 699, 874 A.2d 434, 437 (2005). As Judge Blake noted in *Hauk*, a similar case, "Maryland courts recognize that attorneys' fees are recoverable as actual damages in certain circumstances, namely 'where the wrongful acts of the defendants [have] involved the plaintiff in litigation with others, or placed him in such relation with others as make it necessary to incur expense to protect his interest.'" 749 F. Supp. 2d at 369-70 (quoting *Montgomery Village Assocs. v. Mark*, 95 Md. App. 337, 620 A.2d 975, 979 (1993)).

Here, plaintiff alleges that she paid attorney's fees to protect her interest in her property during loan modification discussions and with respect to possible foreclosure. This does not constitute a claim for legal fees in regard to plaintiff's pursuit of the underlying action.

---

[21] Defendants concede that plaintiff may recover attorney's fees in a successful action to enforce liability under the FDCPA, pursuant to 15 U.S.C. § 1692k(a)(3). *See* Memo at 27 n.15.

Therefore, at this juncture, plaintiff may pursue damages for attorney's fees incurred with respect to defending against allegedly improper debt collection activities.

### Conclusion

For the foregoing reasons, I will GRANT in part and DENY in part defendants' Motion to Dismiss (ECF 10).  A separate Order consistent with this Memorandum follows.


Date: March 11, 2013                                    _____/s/_____
                                                                          Ellen Lipton Hollander
                                                                          United States District Judge