IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTIE ADEMILUYI,

    *Plaintiff*,

    v.

PENNYMAC MORTGAGE
INVESTMENT TRUST HOLDINGS
I, LLC n/k/a PENNYMAC
HOLDINGS, LLC,

    *Defendants*.

Civil Action No. ELH-12-00752

**MEMORANDUM OPINION**

This action arises out of the attempt by defendant PennyMac Holdings, LLC ("PennyMac")[1] to collect plaintiff Christie Ademiluyi's delinquent mortgage debt without a debt collection license, allegedly in violation of the Fair Debt Collection Practices Act ("FDCPA" or the "Act"), 15 U.S.C. §§ 1692 *et seq.*, as well as the Maryland Collection Agency Licensing Act ("MCALA"), Md. Code (2010 Repl. Vol., 2012 Supp.), § 7-301 of the Business Regulation Article ("B.R."). *See* ECF 53 ("Amended Complaint"). Ademiluyi seeks statutory damages as well as attorney's fees and costs. *Id*. at 27.

Plaintiff initially filed her Complaint in March 2012, as a putative class action, alleging violations of the FDCPA, MCALA, and other provisions of Maryland and federal law, seeking damages in excess of eight million dollars. ECF 1. Plaintiff named as defendants both PennyMac and a related entity, PennyMac Mortgage Investment Trust ("Trust"). *Id*. at 1.

---

[1] PennyMac was formerly known as PennyMac Mortgage Investment Trust Holdings I, LLC. *See* ECF 69 (cross-motion for summary judgment) at 1. PennyMac generally refers to itself as "Holdings" in the pleadings.

PennyMac and Trust filed a motion to dismiss in May 2012, ECF 10 ("MTD Motion"), with exhibits.  After substantial briefing by the parties, *see* ECF 11, 12, 15, 16, 20, 22, 23, 24, 25, I granted in part and denied part defendants' MTD Motion.  *See* ECF 26 ("MTD Memorandum"); ECF 27 ("MTD Order") (*Ademiluyi v. PennyMac Mortgage Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502 (D. Md. 2013)).  In effect, I dismissed all of plaintiff's claims against Trust, and certain claims against PennyMac.  ECF 27.  But, I denied PennyMac's MTD Motion with respect to part of plaintiff's claim under the Maryland Mortgage Fraud Protection Act ("MMFPA"), *see* ECF 27, a claim which plaintiff has since abandoned.  *Compare* Complaint, ECF 1 (Complaint) *with* Amended Complaint, ECF 53.  I also denied PennyMac's MTD Motion with respect to plaintiff's FDCPA claim, *see* ECF 27, which is the only claim that remains pending.  *See* ECF 53.  *See also Bradshaw v. Hilco Receivables, LLC*, 765 F. Supp. 2d 719, 728-31 (D. Md. 2011) (holding failure to obtain license required by MCALA is a violation of the FDCPA).

Plaintiff filed an Amended Complaint in March 2014, near the end of discovery, which removed Trust as a defendant, as well as plaintiff's MMFPA claim and her claim for actual damages under the FDCPA.  *Id*.  It also included new factual allegations gleaned in discovery. *Id*.

Plaintiff subsequently filed a Motion for Summary Judgment (ECF 62, "Plaintiff's Motion"), with a supporting memorandum of law (ECF 62-1, "Plaintiff's Memo"), and a Motion to Certify a Class (ECF 61, "Class Motion").  In response, PennyMac filed a Cross-Motion for Summary Judgment (ECF 69, "Defendant's Motion"), with a supporting memorandum of law (ECF 69-1, "Defendant's Memo"), and opposed both plaintiff's Motion and the Class Motion. *See* ECF 68.  Plaintiff has replied and has opposed Defendant's Motion.  ECF 72 ("Plaintiff's

Reply"). Defendant replied to plaintiff's opposition. ECF 74 ("Defendant's Reply"). Both sides

have also filed a "Statement of Material Facts not in Dispute," *see* ECF 60 ("Plaintiff's Facts");

ECF 67 ("Defendant's Facts"), along with numerous exhibits.

In February 2015, for the reasons described in a Memorandum Opinion issued on

February 10, 2015, I denied the Class Motion. *See* ECF 97 (Memorandum); ECF 98 (Order).

Plaintiff's Motion and Defendant's Motion (collectively, the "Motions") have been fully

briefed, and no hearing is necessary to resolve them. *See* Local Rule 105.6. For the reasons that

follow, I will grant Defendant's Motion (ECF 69) and deny Plaintiff's Motion (ECF 62).

## I.  Factual Background[2]

### A. The Parties

Christie Ademiluyi is a licensed real estate broker who, at all relevant times, has resided

on Maple Street in Laurel, Maryland (the "Property"). *See* Defendant's Facts Ex. 3, Deposition

of Christie Ademiluyi dated Oct. 28, 2013 ("C. Ademiluyi Depo."), ECF 67-21 at 9-10, 4-5.

PennyMac "invests in mortgage assets." *See* Plaintiff's Facts Ex. 2, Deposition of Jeffrey

P. Grogin dated Jan. 14, 2014 ("Grogin Depo."), ECF 60-2 at 5. And, as the owner of the assets,

*id.* at 4, it then "contracts for mortgage servicing with another company and it contracts for

---

[2] In order to contextualize the dispute at issue, I rely throughout the Factual Background on certain exhibits filed by defendant in support of the earlier MTD Motion. Plaintiff has not challenged the authenticity of these documents at any stage in the litigation, and they remain part of the record.

Additionally, because many of the exhibits and the arguments in legal memoranda rely on plaintiff's personally identifiable financial information, *see* ECF 71-1 (consent motion to seal), some of the information on which I rely comes from documents submitted to the Court under seal. However, because I have not included in this Memorandum Opinion any of plaintiff's personally identifiable financial information, I need not seal or redact the Memorandum Opinion. Additionally, unsealed, redacted versions of the Defendant's Memo and Defendant's Facts are filed at ECF 71-5 and ECF 71-4, respectively. Defendant's Reply (ECF 74), as originally filed, is unsealed and redacted.

investment advisory services with another company." *Id*. at 5-6. According to Jeffrey P. Grogin, who served as PennyMac's Secretary and Chief Administrative and Legal Officer as of June 2014,[3] *see* Defendant's Facts Ex. 2, Affidavit of Jeffrey P. Grogin ("Grogin Aff."), ECF 67-19 ¶ 1, PennyMac "does not have any employees and it does not conduct any operations whatsoever." Grogin Depo., ECF 60-2 at 5. Grogin describes PennyMac's "business thesis" as "to modify loans." *Id*. at 6. In other words, "the premise of the company is to acquire, in some instances, loans that can be modified so that borrowers get to stay in their homes." *Id*.

It is undisputed that, at the commencement of this action, PennyMac did not have a debt collection license in the State of Maryland. Nor was it licensed as a mortgage lender in Maryland. *See* ECF 57 (Answer to Amended Complaint) ¶ 14; Plaintiff's Facts, ECF 60 at 6.

PennyMac is a subsidiary of former defendant Trust. Grogin Depo., ECF 60-2 at 5. Trust describes itself in filings with the U.S. Securities and Exchange Commission ("SEC") as "a specialty finance company that invests primarily in residential mortgage loans and mortgage-related assets." MTD Motion Ex. D, Form 10-K filed with the SEC for FY ending Dec. 31, 2011 ("Form 10-K"), ECF 10-6 at 5. Trust does not have any employees. *Id*. at 8. It is managed by PNMAC Capital Management, LLC ("PCM"), which is a wholly-owned subsidiary of Private National Mortgage Acceptance Company, LLC ("PNMAC"). *Id*. at 5. "Most of the loans" Trust holds in its investment portfolio are serviced "by another wholly-owned PennyMac subsidiary, PennyMac Loan Services, LLC" ("Services"). *Id*.

Trust's manager, PCM, "specializes in acquiring distressed residential mortgage assets that are sold by financial institutions including banks, thrifts, and non-bank mortgage lenders."

---

[3] It is not clear from the record when Grogin's roles with PennyMac began or ended.

Form 10-K, ECF 10-6 at 6.   Services's "activities include collecting principal, interest and escrow account payments, if any, with respect to mortgage loans, as well as managing loss mitigation, which may include, among other things, collection activities, loan workouts, modifications and refinancings, foreclosures, short sales, sales of REO[4] and financing to facilitate such sales."  *Id*. at 7-8.   Services "provides … servicing to the [PNMAC] funds and entities in which they have invested as well as third parties."  *Id.* at 8.

In briefings on the MTD Motion, PennyMac asserted that Services was, at all relevant times, "appropriately registered under Maryland law as a mortgage lender and … therefore exempted from the MCALA licensing requirement."  *See* ECF 10-1 at 12; *see also* ECF 69-1 at 12.  Plaintiff has not disputed this contention, nor has she named Services as a defendant.

### B. The Debt & The Forbearance

On April 30, 2007, plaintiff executed an Adjustable Rate Note for $465,000 ("Note") with lender ABN AMRO Mortgage Group, Inc. ("ABN").  *See* Note, MTD Motion Ex. A, ECF 10-3.  The Note was secured by the Property, as reflected in the Deed of Trust dated April 30, 2007 ("Deed").  Deed, MTD Motion Ex. B, ECF 10-4.  The Deed was recorded in the land records of Prince George's County, Maryland.  *Id.*

Sometime within the next two years, as a result of a drop "to zero" in plaintiff's real estate sales business, plaintiff fell behind on her mortgage payments due under the Note.  *See* Defendant's Facts Ex. E, ECF 67-6 at 30 (letter from plaintiff to mortgage servicer dated September 2009).  It appears that CitiMortgage, Inc. ("Citi") had acquired the Note by that time.

---

4 "REO" stands for "Real Estate Owned" and refers to "real estate property which has been foreclosed upon by lenders or taken by deed-in-lieu of foreclosure in full or partial satisfaction of debt."  4 Baxter Dunaway, L. DISTRESSED REAL ESTATE § 49:1 (2014).  "In other words, it is real estate owned by lenders as a result of loans gone bad."  *Id.*

*See* C. Ademiluyi Depo., ECF 67-21 at 13-14; Note, ECF 10-3 at 5 (Note Allonge referencing undated transfer of interest in the Note to Citi as successor by merger with ABN); ECF 67-6 at 30 (2009 letter to Citi).

In the Fall of 2009, plaintiff filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code. *See* Amended Complaint, ECF 53 ¶ 34; *In re Ademiluyi*, 09-24463 (D. Md. Bankr. filed Aug. 5, 2009). She also applied for a federally subsidized loan modification through Citi.[5] *See* Defendant's Facts Ex. D, "Home Affordable Modification Program Hardship Affidavit," ECF 67-5 at 2; Defendant's Facts Ex. 6, Deposition of April Ademiluyi, Esq., dated Apr. 3, 2014 ("A. Ademiluyi Depo."), ECF 67-24 at 12.[6]

In October 2009, plaintiff entered into a trial modification program with Citi, A. Ademiluyi Depo., ECF 67-24 at 12, with significantly lower monthly payments than called for by the Note. C. Ademiluyi Depo., ECF 67-21 at 16. Plaintiff completed her bankruptcy proceeding in November 2009. *See In re Ademiluyi*, 09-24462, Doc. 21 ("Final Decree" and closure of case). Although the parties have not provided any details regarding the bankruptcy matter, it appears that plaintiff's obligation with respect to the Note survived the proceedings. *Cf. In re Ademiluyi*, 09-24462, Doc. 5 ("Chapter 7 Individual Debtor's Statement of Intention,"

---

[5] Plaintiff applied for what is often called, in the record, a "HAMP modification;" HAMP is an acronym for "Home Affordable Modification Program." *See*, *e.g.*, ECF 67-5 (HAMP Affidavit); U.S. Department of the Treasury, "Home Affordable Modification Program," MAKINGHOMEAFFORDABLE.GOV (Sept. 4, 2014). In Defendant's Facts, PennyMac described HAMP as "a program created by the U.S. Department of the Treasury … in 2009 to address the growing number of foreclosures by encouraging loan services to reduce monthly mortgage payments for struggling homeowners." ECF 67 at 7. *See also* Thomas M. Schehr & Matthew Mitchell, *The Home Affordable Modification Program and A New Wave of Consumer Finance Litigation*, 91-JUN MICH. B.J. 38, 38 (2012) ("HAMP works by providing financial incentives … to participating mortgage servicers to modify the terms of certain eligible loans to a level that is affordable for borrowers now and sustainable over the long term.").

[6] April Ademiluyi is plaintiff's daughter and her current attorney.

showing plaintiff intended to reaffirm her debt owed to Citi and secured by the Property).[7] Further, it appears that plaintiff successfully made all payments due under her trial loan modification.  *See* C. Ademiluyi Depo., ECF 67-21 at 16 (plaintiff stating she made her payments under the trial agreement).

Plaintiff entered into a permanent loan modification with Citi in June 2010, which required higher monthly payments than the trial modification agreement.  A. Ademiluyi Depo., ECF 67-24 at 14; ECF 53 ¶ 35.  Plaintiff maintains that she unintentionally entered into this agreement by opening an e-mail.  C. Ademiluyi Depo., ECF 67-21 at 16-19.  With the help of her daughter, April Ademiluyi, Esquire, plaintiff disputed with Citi that she had actually agreed to the modification, and continued to seek a new agreement with Citi until, in January 2011, plaintiff submitted a new loan modification application to Citi.  A. Ademiluyi Depo., ECF 67-24 at 14-17; ECF 53 ¶ 36, 38; C. Ademiluyi Depo., ECF 67-21 at 21.

Meanwhile, in December 2010, plaintiff entered into a forbearance agreement (the "Forbearance") with Citi.  Defendant's Facts Ex. 12, ECF 67-30 at 2 (copy of Forbearance agreement between plaintiff and Citi with signature dated Dec. 28, 2010); Defendant's Facts Ex. 23, ECF 67-41 at 2 (letter from plaintiff to Citi dated Nov. 30, 2010 requesting forbearance); A.

---

[7] "A reaffirmation agreement is an agreement between a debtor and a creditor that the debtor will pay a debt that the debtor incurred before the bankruptcy filing."  3 Dunaway L. DISTRESSED REAL ESTATE § 28A:80 (2014); *see also* 4-524 COLLIER ON BANKRUPTCY P 524.04 (16th ed. 2009) (outlining requirements for enforceability of reaffirmation agreements).  In her Amended Complaint, plaintiff avers that she "had been discharged of her liability for the underlying note … ."  ECF 53 ¶ 51.  However, that assertion does not comport with the evidence in this case, *i.e.*, with the undisputed facts that plaintiff remained in her home after bankruptcy and that she continued to make payments due under the Note.  In any event, even if it were true that plaintiff's obligation under the Note was discharged in bankruptcy, for reasons described below, that would not change the outcome of this case because, either way, PennyMac was not a "debt collector" within the meaning of the FDCPA and is therefore not subject to its prohibitions.

Ademiluyi Depo., ECF 67-24 at 16.  The Forbearance provided, in relevant part, as follows, ECF

67-30 at 2:[8]

> *In return for CitiMortgage, Inc., ... forbearing from proceeding with the pending*
> *foreclosure* [9] *of my mortgage loan, which is still in default under the original*
> *security instruments, we agree to the following terms and conditions*:
>
> Monthly Payments: A payment of $4,374.70 must be received … on or before
> 12/28/10 in certified funds.  Payments will be received … on the 30TH day of
> every month of $418.33 plus the regular mortgage payment of $2187.35 totaling
> $2605.68 for SEVENTEEN (17) consecutive months beginning on 1/30/11 and
> ending 05/30/12, with a last payment amount totaling $2605.08.  Regular monthly
> payments of $2187.35 will resume on 06/01/12.
>
>         \*\*\*
>
> *We understand that if the above terms and conditions or the terms of the original*
> *security instrument are not met, a default will occur and this forbearance will be*
> *voided*.  If a default occurs, [Citi] may proceed with foreclosure immediately.
> There is no grace period for late or partial payments and you will not receive an
> additional 30-day demand letter.   All funds will be applied first towards
> outstanding fees, as allowed by applicable law.  Once fees are paid in full, funds
> will then be applied towards principal, interest, and, if applicable, escrow
> amounts.  We understand that all the rights and obligations of the original note
> and security instrument, *except as changed by this payment plan*, remain in full
> force. …

In short, the Forbearance spread plaintiff's outstanding mortgage loan delinquency across

seventeen months, to be paid in addition to the regular payment due under the Note.  *Id*.  In

exchange, Citi agreed not to foreclose on plaintiff's home so long as plaintiff complied with the

terms of the Forbearance.  *Id*.

It appears that plaintiff made a substantial payment on December 27, 2010, *see*

Forbearance, ECF 67-30 at 2 (handwritten notation), and that the first payment due under the

_____

[8] I have substituted the document's own added-emphasis with my own.

[9] There is no indication in the record that Citi took any formal steps to initiate foreclosure
at this time; the agreement presumably references a threatened pending foreclosure.

Forbearance was received in full on or before December 30, 2010.  Defendant's Facts Ex. K, ECF 67-12 (copy of plaintiff's payment history while loan was serviced by Citi) at 2;[10] C. Ademiluyi Depo., ECF 67-21 at 22 (showing plaintiff agrees she made full payment of "$4,374,70 on or before December 28, 2010").  According to a copy of plaintiff's payment history while her loan was serviced by Citi (ECF 67-12, "Citi Payment Record"), the first full payment due under the Forbearance was applied to satisfy payments due under the Note in August and September, presumably of 2010.  ECF 67-12 at 2.

On or before January 28, 2011, plaintiff made another payment of $2187.35.  Citi Payment Record, ECF 67-12 at 2.   According to the Forbearance, that amount was equal to plaintiff's regular mortgage payment.  ECF 67-30 at 2.  Citi applied that payment to satisfy the payment due under the Note in October 2010.  *Id.*  The Citi Payment Record also shows a "Single Receipt" of $418.33 paid at the same time, *i.e.*, on or before January 28, 2011.  ECF 67-12 at 2.  That amount is equal to the extra monthly payment due under the Forbearance.  *See* Forbearance, ECF 67-30 at 2.

According to PennyMac, it was assigned plaintiff's Note on February 28, 2011, before plaintiff's next payment was due under the Forbearance.   PennyMac relies on an Affidavit by Michael Drawdy, Senior Vice President for Asset Management of Services, to support this assertion.  *See* Defendant's Facts Ex. 1, Affidavit of Michael Drawdy ("Drawdy Aff."), ECF 67-1; Defendant's Facts, ECF 67 ¶ 14 (relying on Drawdy Aff. ¶ 7); Defendant's Memo, ECF 69-1 at 29 (relying on Defendant's Facts ¶ 14 for date of acquisition).  Drawdy avers, in relevant part:

---

[10] The exhibit is described and authenticated in an affidavit of Michael Drawdy, Senior Vice President for Asset Management of Services, dated June 2014.  *See* Defendant's Facts Ex. 1, ECF 67-1 ¶ 12.

"Holdings [*i.e.*, PennyMac] acquired Plaintiff's loan on February 28, 2011 … ."  ECF 67-1 ¶ 7.

Additionally, in her Amended Complaint, plaintiff avers that PennyMac sent her a letter dated

March 28, 2011, in which PennyMac "claimed that it had acquired ownership of Ms.

Ademiluyi's loan on February 28, 2011."  ECF 53 ¶ 40.[11]  *See also* A. Ademiluyi Depo., ECF

67-24 at 17 ("Q: Subsequently the loan was transferred to PennyMac in or about February 2011.

Is that your understanding? A: Yes.").

In her Reply, plaintiff disputes PennyMac's contention that "the loan was acquired on

February 28, 2011."  ECF 72 at 7.  She asserts:  "The actual assignment is dated March 9, 2011."

*Id.*   In support, plaintiff cites one of her own exhibits, titled "Assignment of Mortgage"

("Assignment").  *Id.* (citing Plaintiff's Facts Ex. 9, ECF 60-9).  The Assignment shows that an

assignment of the mortgage from Citi to PennyMac was executed on March 9, 2011.  *Id.* at 2; *see*

*also* MTD Motion Ex. C, ECF 10-5 at 2 (copy of same document).

From February 28, 2011, through March 25, 2011, Citi continued to service plaintiff's

loan on behalf of PennyMac.  *See* Drawdy Aff., ECF 67-1 ¶ 7.  On March 26, 2011, Services

assumed the servicing of plaintiff's loan on behalf of PennyMac.  *Id.*; Amended Complaint, ECF

53 ¶ 42.  A copy of an undated "Notice of Assignment, Sale, or Transfer of Servicing Rights"

submitted by defendant states:  "You are hereby notified that the servicing of your mortgage

loans, that is, the right to collect payments from you, is being assigned, sold or transferred from

CitiMortgage, Inc. to PennyMac Loan Services, LLC effective March 26, 2011."  Defendant's

Facts Ex. M, ECF 67-14 at 2.  The notice further instructed that the "present servicer", Citi,

would stop accepting payments on March 25, 2011, that the new servicer would start accepting

---

[11] To the best of my knowledge, a copy of the letter plaintiff references in her Amended
Complaint is not in the record.  At the very least, no one has pointed the Court to it.

payments on March 26, 2011, and that all payments due on or after March 26, 2011, should be sent to the new servicer, Services.  *Id.*

In her Amended Complaint, plaintiff states that PennyMac "collected indirectly through its servicer CitiMortgage Inc., Ms. Ademiluyi's mortgage payments made on or about March 1, 2011 and March 31, 2011 by electronic funds transfer."  ECF 53 ¶ 41.  The Citi Payment Record shows a "Single Receipt" of $2,605.68 on February 28, 2011, which is equal to the full monthly payment (regular mortgage payment plus extra) due under the Forbearance.  ECF 67-12 at 2. The Citi Payment Record also appears to show that Citi registered the November 2010 payment due under the original Note as paid on March 1, 2011.  *Id.*  The Citi Payment Record does not show any transactions on any date after March 28, 2011.  *Id.*  The last transaction on the Citi Payment Record is an entry dated March 28, 2011, and titled "Service Release."  *Id.*  For reasons that are neither explained nor apparent, the Citi Payment Record also shows a $366.40 charge on the same day, March 28, 2011, under a column labeled "Late Charge."  *Id.*  Under the Forbearance, plaintiff's next payment was not due until March 30, 2011.  ECF 67-30 at 2.  I am unaware of any communications in the record between Citi and plaintiff during the period when Citi was servicing plaintiff's loan on behalf of PennyMac.

According to a record of payments made by plaintiff to Services ("Services Payment Record"), submitted by PennyMac, plaintiff's next payment was made on or before April 13, 2011, in an amount equal to the monthly payment due under the Forbearance, *i.e.*, $2,605.68. Defendant's Facts Ex. L, ECF 67-13 at 11.  It appears that plaintiff actually made the payment on March 31, 2011, but that the payment went to Citi and had to be re-routed.  *See* ECF 53 ¶ 41 (alleging PennyMac "collected indirectly through its servicer [Citi] [plaintiff's] mortgage

payments made on or about March 1, 2011 and March 31, 2011 by electronic funds transfer");

Defendant's Reply, ECF 74 at 6 (chart showing plaintiff's payments under the Forbearance

made, *inter alia*, on "2/28/11" and "3/31/11").   In any event, on April 13, 2011, Services

allocated $2187.35 of the payment to satisfy the amount due under the original Note on

December 1, 2010, and held the remainder, $418.33, in suspense.   *Id*.   The most recent

transaction date listed on the Services Payment Record is September 27, 2013.   *Id*. at 2.   It does

not show any other mortgage payments received from plaintiff after April 13, 2011, and on or

before September 27, 2013.   *Id*. at 2-11.   In other words, it appears that plaintiff did not make

any mortgage payments during that period.

The parties' briefs and the exhibits present voluminous facts relating to Services's

conduct with respect to plaintiff and her debt, beginning in early April 2011 and stretching

beyond commencement of this action.   *E.g.*, Plaintiff's Facts Ex. 6-C, ECF 60-6 at 18 (letter

from Services to plaintiff dated April 25, 2011); Ex. 10, ECF 60-10 (transcript of call between

plaintiff and representative of Services); Defendant's Facts Ex. N, ECF 67-15 (letters to plaintiff

from Services with dates ranging from April 7, 2011 through August 8, 2012); Ex. P, ECF 67-17

(correspondence between Services and Fannie Mae[12] and HAMP Solution Center regarding

---

[12] "Fannie Mae" is the common name for an entity known as the "Federal National
Mortgage Association."   *See* Kate Pickert, "A Brief History of Fannie Mae and Freddie Mac,"
TIME   (July   14,   2008),   *available   at*   http://content.time.com/time/business/article/
0,8599,1822766,00.html.   Fannie Mae was created by Congress in 1938 "in order to buy
mortgages from lenders, freeing up capital that could go to other borrowers."   *Id*.   In 1968, it
"was converted into a publicly traded company owned by investors."   *Id*.   Today, Fannie Mae
states that it is "the leading source of residential mortgage credit in the U.S. secondary market,"
with a mission "to provide reliable, large-scale access to affordable mortgage credit in all
communities   across   the   country   …   ."   Fannie   Mae,   "Company   Overview,"
WWW.FANNIEMAE.COM (Feb. 20, 2015).

eligibility of plaintiff's loan for second HAMP modification); Ex. 8, ECF 67-26 (bank statements submitted by plaintiff to Services); Ex. 9, ECF 67-27 (same); Ex. 10, ECF 67-28 (same); Ex. 14, ECF 67-32 (correspondence between Services and A. Ademiluyi regarding new loan modification).

In brief, Services did not know that plaintiff had entered into a Forbearance agreement with Citi when it began working with her.  C. Ademiluyi Depo., ECF 67-21 at 38; A. Ademiluyi Depo., ECF 67-24 at 19-20.  Apparently, Services regarded plaintiff's debt as in default.  *See*, *e.g.*, Plaintiff's Facts Ex. 10, ECF 60-10; C. Ademiluyi Depo., ECF 67-21 at 38; Defendant's Facts Ex. N, ECF 67-15 at 40.  However, it agreed to pick up where Citi had left off in reconsidering a second HAMP modification.  *E.g.* A. Ademiluyi Depo., ECF 67-24 at 17-20. But, in February 2012, Services ultimately rejected the possibility of a second HAMP modification and offered plaintiff its own proprietary loan modification, which plaintiff rejected. *E.g.*, *id.* at 20-29; Defendant's Facts Ex. Q, ECF 67-18 at 2.

Plaintiff filed this lawsuit in March 2012, shortly after she rejected Services's proposed loan modification.  ECF 1.  Roughly five months later, in mid October 2013, plaintiff received a "Notice of Intent to Foreclose," in the form required by Md. Code (2010 Repl. Vol.), § 7-105.1(c) of the Real Property Article ("R.P.").  *See* Plaintiff's Facts Ex. 11, ECF 60-11 ("Foreclosure Notice").  In list form, it stated that the "Date of Most Recent Loan Payment Received" was on April 13, 2011; that the "Period to Which Most Recent Loan Payment Was Applied" was December 1, 2010; and that the "Date of Default" was January 2, 2011.  ECF 60-11 at 3.  PennyMac, via Services and substitute trustees, *see* Plaintiff's Reply Ex. 19, ECF 72-8 ("Appointment of Substitute Trustees"), filed the Foreclosure Notice in the Circuit Court for

Prince George's County, Maryland on March 5, 2014. *See* Plaintiff's Reply Ex. 21, Declaration of Attorney Phillip Robinson ("Robinson Decl."), ECF 72-10 ¶ 7; *see also WBGLMC v. Ademiluyi*, Case No. CAEF-14-05517 ("Foreclosure Proceeding"). Plaintiff has submitted to this Court additional documents from the Foreclosure Proceeding, including an "Affidavit of Default Pursuant to Maryland RP 7-105.1(c)(ii)(1) and Md Rule 14-207(b)(8)." Plaintiff's Reply Ex. 17, ECF 72-6 at 2. PennyMac, via its agents, states in that document: "The default under the Deed of Trust securing the Note which is the subject of this proceeding, occurred on January 02, 2011 when the defendant(s) did not tender the payment due on January 01, 2011." *Id*.

According to the Foreclosure Proceeding docket, the Foreclosure Proceeding is not yet resolved. *See WBGLMC v. Ademiluyi*, Case No. CAEF-14-05517. A docket entry dated October 14, 2014, indicates that the Maryland State court judge ordered that "the foreclosure sale may go forward as scheduled … ." *Id*. But, the most recent entry, dated October 17, 2014, shows that Ademiluyi filed a "Suggestion of Bankruptcy." *Id*. It appears the entry is referencing Ademiluyi's petition for bankruptcy under Chapter 13 of the U.S. Bankruptcy Code in the District of Maryland. *See In Re Ademiluyi*, Bankr. Case No. 14-25763 (D. Md. Bankr. 2014). In that case, on November 11, 2014, she opened an adversary proceeding against Citi, PennyMac, and Services. *See Ademiluyi v. CitiMortgage, Inc., et al.*, Adv. Pro. Case No. 14-00806 (D. Md. Bankr. 2014). The bankruptcy judge filed a Motion for Withdrawal of Reference, *sua sponte*, which has been assigned to this Court. *See Ademiluyi v. CitiMortgage, Inc. et al.*, ELH-15-00777 (D. Md. opened Mar. 16, 2015) (ECF 1). I granted the Motion for Withdrawal of Reference on April 27, 2015 (ECF 3).

Additional facts are included in the Discussion.

## II.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law.  *Matsushita Elec. Indus. Co. Ltd. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id*.  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts' showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24.  In resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from

them, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Thus, in considering a summary judgment motion, the court may not make credibility determinations.  *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black v. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  For example, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See, e.g., Boone v. Stallings*, 583 F. App'x 174, 176 (4th Cir. Sept. 11, 2014) (per curiam).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact.  *Anderson*, 477 U.S. at 247-48.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.  *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be

insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id*.

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 336–37 (3d ed. 1998, 2012 Supp.).

### III. Discussion

### A. The FDCPA

Congress enacted the FDCPA in 1977, *see* Pub. L. 95–109, 91 Stat. 874 (1977), to protect consumers from debt collectors who engage in "abusive, deceptive, and unfair debt collection practices, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against collection abuses." 15 U.S.C. § 1692(e); *see Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 576 (2010) (same); *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996). The statute is concerned with "rights for consumers whose debts are placed in the hands of the professional debt collectors … ." *DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 161 (2d Cir. 2001); *see also Ruth v. Triumph Partnerships*, 577 F.3d 790, 797 (7th Cir. 2009). "A significant purpose of the Act" is the elimination of

"abusive practices by debt collectors … ."  *Brown v. Card Service Center*, 464 F.3d 450, 453 (3d

Cir. 2006).  Because the FDCPA is a remedial statute, *id.*, it is construed liberally in favor of the

debtor.  *See*, *e.g.*, *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 393 (4th Cir. 2014)

(citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561–62 (1987) (recognizing

the canon of statutory interpretation that remedial statutes are to be construed liberally)); *Glover*

*v. F.D.I.C.*, 698 F.3d 139, 149 (3d Cir. 2012); *Hamilton v. United Healthcare of La.*, 310 F.3d

385, 392 (5th Cir. 2002).

Section 1692e(5) of Title 15 of the United States Code provides:  "A debt collector may

not use any false, deceptive, or misleading representation or means in connection with the

collection of any debt. Without limiting the general application of the foregoing, the following

conduct is a violation of this section: … (5) The threat to take any action that cannot legally be

taken or that is not intended to be taken."  Section 1692f of the same Title states, *inter alia*:  "A

debt collector may not use unfair or unconscionable means to collect or attempt to collect any

debt."

To establish a claim under the FDCPA, "a plaintiff must prove that: '(1) the plaintiff has

been the object of collection activity arising from consumer debt; (2) the defendant is a debt

collector as defined by the FDCPA; and (3) the defendant has engaged in an act or omission

prohibited by the FDCPA.'"  *Boosahda v. Providence Dane LLC*, 462 F. App'x 331, 333 n.3 (4th

Cir. 2012) (quoting *Ruggia v. Wash. Mut.*, 719 F. Supp. 2d 642, 647 (E.D. Va. 2010)); *see*

*Stewart v. Bierman*, 859 F. Supp. 2d 754, 759 (D. Md. 2012).  "Debt collectors that violate the

FDCPA are liable to the debtor for actual damages, costs, and reasonable attorney's fees.  15

U.S.C.  §  1692k(a)(1), (a)(3)."  *Russell*, 763 F.3d at 389.  "The FDCPA also provides the

potential for statutory damages up to $1,000 subject to the district court's discretion.   *Id.* §
1692k(a)(2)(A)."   *Id.*

The Act defines the term "debt collector," in relevant part, as "any person who uses any
instrumentality of interstate commerce or the mails in any business the principal purpose of
which is the collection of any debts, or who regularly collects or attempts to collect, directly or
indirectly, debts owed or due or asserted to be owed or due another."   15 U.S.C. § 1692a(6).
Therefore, to be subject to the FDCPA, the entity must be "a business the principal purpose of
which is the collection of any debts," or one that "regularly collects or attempts to collect …
debts … ."   15 U.S.C. § 1692a(6); *see Schlegel v. Wells Fargo Bank, N.A.*, 720 F.3d 1204, 1208-
09 (9th Cir. 2013); *Police v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 404 (3d Cir. 2000).

However, the Act further specifies that the definition of "debt collector" "does not
include" an entity that is "collecting or attempting to collect any debt … to the extent such
activity … (iii) concerns a debt which was not in default at the time it was obtained by such
person; … ."   *Id.* § 1692(a)(6)(F)(iii).   Generally speaking, entities servicing or collecting a debt
they were assigned before default are considered "creditors" under the Act.   A "creditor" is
defined as "any person who offers or extends credit creating a debt or to whom a debt is owed,
but such term does not include any person to the extent that he receives an assignment or transfer
of a debt in default solely for the purpose of facilitating collection of such debt for another."   15
U.S.C. § 1692a(4).

"The structure of the Act suggests that" an entity receiving or attempting to collect
money due on a debt "must be one or the other," that is, either a debt collector or a creditor.
*Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 538 (7th Cir. 2003); *see F.T.C. Check*

*Investors, Inc.*, 502 F.3d 159, 173 (3d Cir. 2007) ("[A]s to a specific debt, one cannot be both a 'creditor' and a 'debt collector,' as defined in the FDCPA, because those terms are mutually exclusive."); *accord*, *e.g.*, *Bradford v. HSBC Mortgage Corp.*, 829 F. Supp. 2d 340, 348 (E.D. Va. 2011).  In other words, creditors and debtors are generally "mutually exclusive" categories under the FDCPA.  *Schlosser*, 323 F.3d at 536.

Provided the entity meets the basic criteria to be either a "debt collector" or a "creditor" under the FDCPA, the status of the entity (*i.e.*, debt collector versus creditor) in any given case is determined with respect to the particular debt at issue, and depends on the purpose for which the entity is assigned the debt.  *See* 15 U.S.C. § 1692a(4) (excluding from definition of "creditor" a person who "receives an assignment or transfer of *a debt* in default *solely for the purpose of facilitating collection* of such debt for another") (emphasis added); *id.* § 1692(a)(6)(F)(iii) (excluding from definition of "debt collector" a person who is collecting "any debt … to the extent such activity … (iii) concerns *a debt* which was not in default at the time it was obtained …") (emphasis added).  "If the one who acquired the debt continues to service it, it is acting much like the original creditor that created the debt."  *Schlosser*, 323 F.3d at 536.  "On the other hand, if [the entity] simply acquires the debt for collection, it is acting more like a debt collector."  *Id*.

"To distinguish between these two possibilities, the Act uses the status of the debt at the time of the assignment … ."  *Schlosser*, 323 F.3d at 536; *see also* 15 U.S.C. § 1692a(4); *id.* § 1692(a)(6)(F)(iii);[13]  Plaintiff's Memo, ECF 62-1 at 12-13 (quoting *Ruth*, *supra*, 577 F.3d at

---

[13]  Of course, an entity that does not also meet the general criteria defining "debt collector" in 15 U.S.C. § 1692a(6), would not be subject to the FDCPA even if it were assigned a debt already in default.

796)) ("'Where, as here, the party seeking to collect a debt did not originate it but instead acquired it from another party, we have held that the party's status under the FDCPA turns on whether the debt was in default at the time it was acquired.'").     The  Sixth  Circuit  has summarized the basic analysis as follows, *Bridge v. Ocwen Federal Bank, FSB*, 681 F.3d 355, 359 (6th Cir. 2012):

> For an entity that did not originate the debt in question but acquired it and attempts to collect on it, that entity is either a creditor or a debt collector depending on the default status of the debt at the time it was acquired.[1] The same is true of a loan servicer, which can either stand in the shoes of a creditor or become a debt collector, depending on whether the debt was assigned for servicing before the default or alleged default occurred.

*Accord, e.g.*, *Yarney v. Ocwen Loan Servicing, LLC*, 929 F. Supp. 2d 569, 575 (W.D. Va. 2013).

However, the legal status of the debt itself at the time of assignment—*i.e.*, whether it was in default or not in default—is not dispositive.  In order to prevent absurd results under such a rule, courts also look to the entity's behavior with regard to the debt upon assignment.  An entity that mistakenly believes a debt was in default when the entity acquired the debt, for example, and treats it as such, is not freed from the strictures of the Act by its own error.  *Schlosser*, 323 F.3d at 358; *see also Bridge*, 681 F.3d at 362-63; *Gritters v. Ocwen Loan Servicing, LLC*, 14-C-00916, 2014 WL 74151682, at *4 (N.D. Ill. Dec. 31, 2014); *Belin v. Litton Loan Servicing, LP*, 8:06-cv-760-T-24 EAJ, 2006 WL 1992410, at *3 (M.D. Fla. July 14, 2006).  As the Seventh Circuit explained in *Schlosser*, 323 F.3d at 358: "It makes little sense, in terms of the conduct sought to be regulated, to exempt an assignee from the application of the FDCPA based on a status it is unaware of and that is contrary to its assertions to the debtor.  The assignee would have little incentive to acquire accurate information about the status of the loan because, in the context of the mistake in this case, its ignorance leaves it free from the statute's requirements."

- 21 -

Similarly, a creditor that acquired a debt in default, but for the purpose of servicing it, rather than "solely for the purpose of facilitating collection of such debt," 15 U.S.C. § 1692a(4), is also not a "debt collector" under the Act. *See Henson v. Santander Consumer USA, Inc.*, RDB-12-3519, 2014 WL 1806915, at *5 (D. Md. May 6, 2014) (determining that although plaintiffs alleged defendant purchased their debts after they went into default, plaintiffs did not properly allege that the defendant was a debt collector because "there [was] no indication that [defendant] acquired the debt 'solely for the purpose of collection' as opposed to servicing"); *Allen v. Bank of America, N.A.*, 933 F. Supp. 2d 716, 729 (D. Md. 2013) (finding defendant was a creditor under the FDCPA because "it did not acquire the mortgage [at issue] primarily to collect any amount that may have been in default"); *Salvato v. Ocwen Loan Servicing*, 12-CV-0088 JLS (POR), 2012 WL 3018051, at *5 (S.D. Cal. July 24, 2012) ("The deciding factor revolves around how the collection entity behaves with respect to that debt."); *Padgett v. OneWest Bank, FSB*, 3:10-CV-08, 2010 WL 1539839, at *15 (N.D. W.Va. Apr. 19, 2010) ("OneWest received all deposits of IndyMac without regard to whether a debt was in default. Thus, OneWest is not a 'debt collector,' … .").

Notably, the FDCPA does not define the term "default." *See* 15 U.S.C. § 1692a; *Fontell*, 574 F. App'x at 279; *Alibrandi v. Financial Outsourcing Servs.*, 333 F.3d 82, 86 (2d Cir. 2003). The Fourth Circuit, in an unpublished opinion, has said that "a default generally does not occur immediately upon a debt becoming due, unless the terms of the parties' relevant agreement dictate otherwise." *Fontell*, 574 F. App'x at 279.  In a published opinion, the Second Circuit has said that "courts have repeatedly distinguished between a debt that is in default and a debt that is

merely outstanding, emphasizing that only after some period of time does an outstanding debt go into default." *Alibrandi*, 333 F.3d at 86.

Indeed, after surveying judicial decisions and various federal regulations defining default in certain contexts, the Second Circuit determined that although they "reflect inconsistent periods of time preceding default," those sources "all agree that default does not occur until *well after* a debt becomes outstanding." *Id*. at 87 (emphasis added).  It concluded, in any event, "that the FDCPA's broad, pro-debtor objectives would not be served if [it] adopted [the] argument [proffered by plaintiff-debtor] that default occurs immediately after payment becomes due." *Id*. The court reasoned, *id.*:

> … Alibrandi's position involves a curious role reversal—a debtor arguing that his debt was in default at the earliest possible time—and has the paradoxical effect of immediately exposing debtors to the sort of adverse measures, such as acceleration, repossession, increased interest rates, and negative reports to credit bureaus, from which the Act intended to afford debtors a measure of protection. We believe it ill-advised to adopt an approach that precipitously visits these consequences upon debtors.

*See also*, *e.g.*, *Gacy v. Gammage & Burnham*, No. 04-CV-1934-PHX-FJM, 2006 WL 467937, at *2 (D. Ariz. Feb. 23, 2006) (holding plaintiff failed to show a genuine dispute of fact regarding whether debt was in default where "[p]laintiff se[t]forth no definition for 'default' and no rationale for concluding that plaintiff has defaulted on her medical bill by not paying it in full").

Absent other governing law, such as student loan regulations, most courts faced with the issue have thought it sensible to consider the parties' own relevant agreement to define default. *See*, *e.g.*, *De Dios v. Int'l Realty & Investments*, 641 F.3d 1071, 1074 (9th Cir. 2011) ("Although the Act does not define 'in default,' courts interpreting § 1692a(6)(F)(iii) look to any underlying contracts and applicable law governing the debt at issue."); *McKinney v. Cadleway Properties,*

*Inc.*, 548 F.3d 496, 502 n.2 (7th Cir. 2008) (observing that plaintiff "had plainly defaulted on her payment obligations" and citing the terms of the parties' agreement); *Alibrandi*, 333 F.3d at 87 n.5 (noting the interests of relevant parties "will best be served by affording creditors and debtors considerable leeway contractually to define their own periods of default, according to their respective circumstances and business interests"); *see also Fontell*, 574 F. App'x at 278 (suggesting that the "terms of the parties' relevant agreement" govern definition of default); *Prince v. NCO Financial Servs., Inc.*, 346 F. Supp. 2d 744, 747-48 (E.D. Pa. 2004) (discussing Federal Trade Commission staff opinion letter referencing terms of agreement to determine default).

In *Bailey v. Security National Servicing Corp.*, 154 F.3d 384, 385 (7th Cir. 1998), the plaintiff, a debtor, sued the defendants for alleged violations of the FDCPA. The defendants moved for summary judgment, arguing that they were not "debt collectors" and thus not subject to the FDCPA. *Id.* at 386. The Seventh Circuit found that the plaintiff-debtor, who was delinquent on an underlying agreement, but current on a superseding debt agreement—*i.e.*, a forbearance agreement—was not in "default" on the debt within the meaning of the FDCPA. *Id.* at 387. The *Bailey* Court reasoned, *id.*: "Common sense and the plain meaning of the statute require that we distinguish between an individual who comes collecting on a defaulted debt and one who seeks collection on a debt owed under a brand new payment plan, or forbearance agreement that is current." "Otherwise," it continued, "the plaintiff's default could never be superseded by a new payment plan, even one that clearly benefitted both parties at the time it was executed." *Id.* at 388. Observing that defendants pursued the debt under the forbearance

agreement rather than the underlying agreement, the *Bailey* Court affirmed the district court's grant of summary judgment for the defendants, explaining, *id.*:

> [Defendants] sought to collect the debt under the forbearance agreement, which both parties agree was not in arrears at the time the defendants obtained it (and obviously not in default). Because the debt under the forbearance agreement pursued by [defendants] was not in default, the district court was correct that they were not "debt collectors" and thus not subject to the requirements of the [FDCPA].

Relying largely on *Bailey*, other courts faced with similar facts have also concluded that a debt is not "in default" within the meaning of the FDCPA when, at the time of reassignment, the debtor is current in payments due under a superseding agreement. For example, in *De Dios*, 641 F.3d 1071, the Ninth Circuit affirmed the district court's ruling that the defendant was not a "debt collector" because the defendant was assigned unpaid rental payments due to a landlord after the landlord entered into a forbearance agreement with the debtor-tenant. Although the plaintiff was delinquent in rental payments due when the defendant was assigned the debt, the debt was not in default under the forbearance agreement. *De Dios*, 641 F.3d at 1074-76, 1074 n.2. Similarly, in *Dolan v. Fairbanks Capital Corp.*, 930 F. Supp. 2d 396, 415-16 (E.D.N.Y. 2013), the court reasoned:

> Here, as of November 22, 2000 when [defendant] began servicing plaintiff's mortgage, the August 2000 Forbearance Agreement was in effect. That agreement noted that the original loan was in default, (Bhimani Decl., Ex. D at ¶ B), but that [the note holder] was agreeing "to hold the foreclosure in abeyance" pending plaintiff's compliance with a new payment schedule. (Id. ¶ C.) There is no evidence that plaintiff had defaulted on his obligations under the August 2000 Forbearance Agreement as of November 22, 2000.[1]   (See 2d Am. Compl., Ex. 1, Doc. 2 (evidencing that plaintiff submitted his required monthly payment for October 2000 to TMS).). Thus, following the rationale of the Seventh Circuit in *Bailey*, the Court concludes that the relevant debt is the debt plaintiff owed pursuant to the August 2000 Forbearance Agreement and because plaintiff was not in default of that debt as of November 22, 2000, FCC is not a "debt collector" within the meaning of the FDCPA.

*See also Tedder v. Deutsche Bank Nat. Trust Co.*, 863 F. Supp. 2d 1020, 1034 (D. Haw. 2012) (reciting defendants' argument that if the plaintiff's "Forbearance Agreement was not in default, then the servicer is not trying to collect on a debt for FDCPA purposes …" and citing *Bailey*); *In Re Tolliver*, Adv. No. 09-2076, 464 B.R. 720, at *21 (E.D. Ky. Bankr. 2012) ("If [plaintiff] was performing on her forbearance plan at the time [defendant] purchased the Loan, [defendant] is not a debt collector covered under the FDCPA.").

## B. The Contentions

According to plaintiff, defendant is a "debt collector" within the meaning of the FDCPA because, *inter alia*, Ademiluyi's debt was in default when PennyMac acquired it, ECF 62-1 at 7, and "any assignee of consumer debt, if the assignee acquired the debt while it was in default, is a debt collector under the FDCPA." *Id.* at 11.[14] Specifically, plaintiff asserts that PennyMac is liable for its "indirect collection efforts, *i.e.*, the collection activities by and through others." *Id.* at 15. Ademiluyi argues that she is entitled to summary judgment because, in short, she was the object of defendant's indirect collection activity arising from consumer debt, *i.e.*, her mortgage debt, Plaintiff's Memo, ECF 62-1 at 8, 14-15; defendant was and is a "debt collector" within the meaning of the Act, *id.* at 9-15; and defendant violated 15 U.S.C. §§ 1692e(5) and 1692(f)[15]

---

[14] As stated, *supra*, there are multiple statutory elements that a plaintiff must prove in order to establish that a defendant is a "debt collector." *See* 15 U.S.C. § 1692a(6). Some are discussed in Plaintiff's Memo on this point. *See* ECF 62-1 at 8-11. However, because plaintiff's debt was not "in default" and defendant did not treat it as such at the time it acquired the debt, I need not address the parties' positions on other elements of the statutory definition.

[15] As noted, 15 U.S.C. § 1692e(5) concerns a debt collector's use of false or misleading representations, including threatened actions "that cannot legally be taken. . . ." And, § 1692f prohibits the use of "unfair or unconscionable means" to collect or attempt collection of a debt.

when it engaged in collection activities without obtaining the requisite debt collection license under the MCALA.  ECF 62-1 at 15-19.

In response, PennyMac argues that it is entitled to summary judgment because it is not a "debt collector" within the meaning of the Act.  Defendant's Memo, ECF 69-1 at 21-34.  It frames the issue as follows, *id.* at 9: "The principal legal issue in this matter is whether [PennyMac], as the owner of Plaintiff's mortgage loan on the real property owned by Plaintiff … should be regarded as a creditor or a debt collector under the [FDCPA]."  PennyMac advances three potentially dispositive arguments on this point.

First, PennyMac argues it is not a "debt collector" under the Act because it owned plaintiff's debt and was therefore not collecting a debt "for another," as required by the plain text of the statute.  ECF 69-1 at 22-24 (citing, *e.g.*, 15 U.S.C. § 1692a(4)).  Second, even it if it was collecting a debt "for another," PennyMac argues that it did not acquire the debt "solely for the purpose of collection," as demonstrated by, for example, its efforts to modify Ademiluyi's loan before ultimately seeking foreclosure.  *Id.* at 24-29 (citing, *e.g.*, 15 U.S.C. § 1692a(4)).  Finally, PennyMac argues that Ademiluyi's "loan was not in default at the time [PennyMac] acquired it, and therefore [PennyMac] is a creditor, not a debt collector under the FDCPA."  *Id.* at 29-34 (citing, *e.g.*, "15 U.S.C. § 1692a(6) (providing that entities that purchase debts that are ***not*** in default at the date of acquisition are creditors)") (emphasis in Defendant's Memo).[16]

---

[16] PennyMac also presents a very brief argument that Ademiluyi's claim should be dismissed because she failed to "provide adequate notice" of her suit to PennyMac before filing, and to "allow a reasonable period to permit" it to address the issue, as required under the Deed. *See* ECF 69-1 at 35.  However, I need not reach this argument because PennyMac is not a debt collector under the FDCPA with regard to plaintiff's debt.  In any event, I note that defendant has advanced this preliminary defense for the first time more than two years after

For the reasons discussed below, I agree with PennyMac that, with respect to Ademiluyi's debt, it is a creditor under the FDCPA because Ademiluyi's loan was not in default when PennyMac acquired it, nor did PennyMac, through its agent, Citi, treat the debt as if it were in default at acquisition.

It is undisputed that in December 2010 Ademiluyi entered into the Forbearance with Citi. Forbearance, ECF 67-30 at 2; Amended Complaint, ECF 53 ¶ 38.  And, there is no genuine dispute that plaintiff was current on her payments due under the Forbearance when PennyMac acquired the debt in early 2011.  *See*, *e.g.*, C. Ademiluyi Depo., ECF 67-21 at 23 ("Q.  At the time that you received notice that your loan had been transferred to Pennymac [sic], were you current in the payments to – A. Yes, yes.") (examination by counsel for defendant); *id.* at 41 ("Q. Did you make a payment in February 2011 pursuant to the terms of the forbearance agreement? A. Yes.") (examination by counsel for plaintiff); Citi Payment Record, ECF 67-12 at 2 (showing Citi received full payments due under Forbearance at the end of December 2010, January 2011, and February 2011).[17]

---

commencement of the action.  *See* ECF 10-1 (memorandum in support of MTD Motion) (lacking this argument).

[17] In Defendant's Memo, ECF 69-1 at 31, PennyMac states:  "The undisputed facts reflect that Plaintiff, by February 28, 2011 when [PennyMac] became the owner of her loan, substantially complied with the CitiMortgage Forbearance."  It adds: "In compliance with the [Citi] Forbearance, Plaintiff remitted the agreed down payment of $4,374.70 by paying two installments on $2,8187.35 on December 30, 2010."  *Id.*  Further, it states:  "Subsequently, Plaintiff also remitted the first monthly payment of $2,187.35 (mistakenly, the amount required under the mortgage, rather than under the forbearance agreement) on January 28, 2011."  *Id.*; *see also id.* at 34 (reiterating assertion that plaintiff was in "substantial compliance" with Forbearance when PennyMac acquired her debt).  Although PennyMac implies that plaintiff did not make the full payment due under the Forbearance on January 28, 2011, the Citi Payment Record submitted by PennyMac, and unchallenged by plaintiff, shows a transaction titled

- 28 -

To be sure, Ademiluyi has asserted that PennyMac conceded, in discovery, that she was not current in her payments under the Forbearance when it acquired the debt.  *See* Amended Complaint, ECF 53 ¶ 40(a), (d); Plaintiff's Facts, ECF 60 at 8 n.39.   In support of this contention, plaintiff relies on PennyMac's Answer to her Amended Complaint (ECF 57 ¶ 44, "Answer") and on the testimony of Drawdy, Senior Vice President for Asset Management of Services (ECF 67-1 ¶ 1), at his deposition on January 14, 2014 (Plaintiff's Facts Ex. 3, ECF 60-3, "Drawdy Depo.").  *See* Amended Complaint, ECF 53 ¶ 40(a), (d); Plaintiff's Facts, ECF 60 at 8 n.39.

In the paragraph of defendant's Answer relied on by plaintiff, PennyMac had stated that it "specifically denies that Plaintiff was meeting her obligation under the forbearance agreement."  *E.g.*, Plaintiff's Facts, ECF 60 at 8 n.39 (quoting Answer, ECF 57 ¶ 44). PennyMac explains that it was responding to plaintiff's allegation that "in '***April 2011***, [she] attempted to make her April mortgage payment to [Services] pursuant to the forbearance agreement she executed with [CitiMortgage]; however, [Services] refused to accept her payment and honor the forbearance agreement.'"   ECF 69-1 at 32 (accurately quoting Amended Complaint, ECF 53 ¶ 44) (alterations and emphasis in original).  Thus, PennyMac argues that "[t]his evidence is immaterial to the question of whether the loan was in default at the time of [PennyMac's] acquisition," because "[b]y April 2011," PennyMac "had owned Plaintiff's loan for over one month … ."  *Id*.  I agree with PennyMac that the cited statement does not concede, nor even support, plaintiff's contention that she was not current in her payments under the Forbearance when PennyMac acquired the debt.

---

"payment" of $2,187.35 and a transaction titled "single receipt" of $418.33 on January 28, 2011, which add up to the full amount due on that date under the Forbearance.  ECF 67-12 at 2.

Plaintiff also relies, *see* ECF 53 ¶ 40(c), (d); ECF 60 at 8 n.39, on the following deposition testimony of Drawdy, ECF 60-3 at 4, given in response to questions from plaintiff's counsel:

> Q.   Okay.   And the loan history you looked at, did it show that it was current at the time that PennyMac obtained it?
> A.   Not current, but on a repayment plan.
> Q.   So PennyMac understood it was under a repayment plan?
> A.   Yes.
> Q.   And if she wasn't under a repayment plan, would she be considered delinquent?
> A.   She—she would be considered current on the repayment plan, delinquent under her mortgage obligation.
> Q.   What's the difference?
> A.   So you would be up to date on your repayment plan.  So if a payment was due in a very particular month, you would be current on that.   But since you're paying payments that are due in the past, your overall mortgage obligation would be delinquent.

Plaintiff also cites other portions of Drawdy's deposition, ECF 60-3 at 7:

> Q.   And would you agree that the term 'extremely past due' would mean more than one month? [(quoting letter sent by Services to plaintiff date April 8, 2011)]
> A.   Yes.
> Q.   So when PennyMac Loan Services took over this servicing, this was more than one month in arrears; correct?
> A.   Correct.
>
> ***
>
> Q.   The monthly payments due under the repayment plan would be greater than the original mortgage payments?
> A.   Correct.
> Q.   Is that because you don't reduce the amount owed? Why would it be greater than?
> A.   What CitiCorp did was to take the delinquency and spread it over 17 months.   So you would take the payment plus the additional amount of the delinquency spread over months and that would increase the payment.

Plaintiff interprets these statements as showing that "PennyMac acknowledged that it believed [plaintiff] was more than one month behind on her mortgage loan when it acquired her mortgage"; that "the repayment plan offered to [plaintiff] did not bring her loan current"; and that PennyMac acquired plaintiff's debt "in default."  *See* ECF 53 ¶ 40(c), (d); ECF 60 at 8 n.39. In response, defendant argues:  "Plaintiff mischaracterizes the testimony to claim that [PennyMac] 'concedes that Plaintiff's loan was "not current" at the time it acquired the loan.' Quite the contrary: as *Bailey* recognizes, a loan may be current for purposes of a forbearance agreement, although there may be overall delinquency on the loan." ECF 69-1 at 33.  Defendant adds that, when plaintiff relies on the April 2011 letter sent by Services, plaintiff "further misuses the Drawdy testimony to focus on Services' activities beyond the appropriate time period." *Id*. at 33.

Again, I agree with PennyMac.   The terms of plaintiff's Forbearance itself state unequivocally that Ademiluyi's "mortgage loan … is still in default under the original security instrument … ."  ECF 67-30 at 2.  No one disputes that plaintiff fell into default under her original Note; that she entered into the Forbearance; and that the original Note was considered in default even after plaintiff signed the Forbearance.  However, as recognized by the *Bailey* Court, the point of a forbearance agreement is to enable a debtor to move into a superseding, non-default status where she is safe from foreclosure and, ideally, eventually able to pay back the full delinquency on more manageable terms, without suffering more onerous legal consequences. *See Bailey*, 154 F.3d at 387-88; *see also Dolan*, 930 F. Supp. 2d at 415.  Thus, to accept plaintiff's implicit argument that a debtor in default can only come out of default by full payment on the debt, and never via a superseding agreement with her lender, would work a perverse harm

on debtors.  *Id.*; *see also Alibrandi*, 333 F.3d at 86 (declining to interpret "default" under the FDCPA in a way that would "have the paradoxical effect of immediately exposing debtors to the sort of adverse measures … from which the Act intended to afford debtors a measure of protection").

To be sure, the parties dispute the exact date that PennyMac acquired the debt.  Plaintiff argues that defendant acquired the debt on March 9, 2011, *see* ECF 72 at 7, ECF 53 ¶ 39, while defendant asserts the earlier date of February 28, 2011.  ECF 67-1 ¶ 7.  But, the dispute is immaterial because plaintiff was current under the Forbearance on both dates.  *E.g.*, ECF 67-12 at 2; *see* Defendant's Reply, ECF 74 at 5 n.2.  It is undisputed that Ademiluyi made her first three payments due under the Forbearance in December 2010, January 2011, and February 2011, *id.*, and that her next payment was not due until March 30, 2011.  Forbearance, ECF 67-30 at 2.

Additionally, plaintiff argues that PennyMac did not *consider her* to be current in her payments under the Forbearance when it acquired her debt.  In her Reply, she contends: "Defendant repeatedly stated before this litigation began that Defendant [sic] was in default as early as January 2, 2011."  ECF 72 at 7.  Plaintiff cites, as evidence, a letter sent by Services to her on May 20, 2011, in which she says "Defendant asserted the loan was in default for non-payment of the 1/1/2011 payment," as well as the Foreclosure Notice, ECF 60-11 at 3, dated October 17, 2013, which lists the "Date of Default" as "1/2/2011."  *Id.* at 7-8.  She concludes: "Even if Defendant has changed its belief now, for purposes of the FDCPA, what matters is what the Defendant believed at the time and it is undisputed that PennyMac believed Ms. Ademiluyi was in default when it acquired her mortgage note."  *Id.* at 8.[18]

---

[18] Of course, PennyMac disputes this point.

In response, PennyMac summarizes its argument as follows, ECF 74 at 3-4:

> … [Defendant's] position that Plaintiff's loan was not in default as of February 28, 2011, the date it acquired her loan, is fully consistent with the January … 2011 date of default set forth in [defendant's] foreclosure proceedings.  As discussed in [Defendant's Facts, ECF 67], … Plaintiff entered into a forbearance agreement with [Citi], whereby she would make 17 forbearance payments in order to cure her delinquency under the original loan terms.  Plaintiff made a down payment on the forbearance plan in December 2010, and a few additional payments to [Citi] in early 2011.  The forbearance payments were credited to past due amounts through December 1, 2010.  Plaintiff stopped making payments in April 2011, subsequent to [defendant's] acquisition of the loan, and thereby defaulted on the forbearance agreement.  [Defendant's] foreclosure notices and filings reference the January … 2011 date of default because, as of April 2011 and thereafter, her loan has only been paid through December 2010 and is due and owing for January 2011.  Nonetheless, because Plaintiff was current on the forbearance agreement as of February 28, 2011 … [defendant] did not acquire Plaintiff's debt in default.

I agree with PennyMac that the statements cited by plaintiff are consistent with defendant's assertion that the debt was not in default when defendant acquired it.  And, the statements do not support an inference that PennyMac believed the debt was in default when it was acquired.  As stated, *supra*, the terms of plaintiff's Forbearance *itself* state unequivocally that Ademiluyi's "mortgage loan … is still in default under the original security instrument … ."  ECF 67-30 at 2.  No one disputes that, and PennyMac's representations in the Foreclosure Proceeding are consistent with that understanding.

Further, the Forbearance also states that it "will be voided" if its "terms and conditions" are not met, and that "[t]here is no grace period for late or partial payments … ."  ECF 67-30 at 2.  It is undisputed that plaintiff stopped making payments due under the Forbearance after, at the latest, April 13, 2011.  *E.g.*, Services Payment Record, ECF 67-13.  Thus, by the time PennyMac sent the letters plaintiff cites in support of her argument, in May 2011 and October 2013, *see* ECF 72 at 7-8, plaintiff was also in default under the terms of the Forbearance.  ECF 67-30 at 2;

*Fontell*, 574 F. App'x at 279.  Accordingly, at the relevant times, the Forbearance was void and the relevant payment date was that due under the original Note.  And, because plaintiff's payments under the Forbearance agreement had brought payments due under the original Note current only through December 2010, *see* ECF 67-12, ECF 67-13, it follows that, as of May 2011 and October 2013, plaintiff owed payments due through January 2011.

Viewing the facts in the light most favorable to Ademiluyi, it is also noteworthy that there is no evidence that PennyMac treated the debt as in default until early April 2011.  *See*, *e.g.*, ECF 67-15 at 40 (letter from PennyMac's agent, Services, to plaintiff dated April 8, 2011, stating: "Our records show that you are extremely past due on your mortgage payments and we are therefore pursuing any and all legal remedies"); ECF 53 ¶ 40 (summarizing relevant alleged facts gleaned in discovery).  At best for plaintiff, the evidence shows only that PennyMac's agent, Services, treated the loan as in default at the time Services was assigned the debt, or soon after.  *Id*.  Under the circumstances present here, no reasonable juror could find that evidence showing Services believed the loan was in default when Services obtained the debt also shows that *PennyMac*, via its agent Citi, believed the loan was in default when PennyMac acquired the debt *roughly one month earlier*.  Again, there is no evidence that Citi treated the debt as in default under the Forbearance agreement while it was servicing the debt on behalf of PennyMac, *i.e.*, in PennyMac's first interactions with plaintiff.  *See also* Defendant's Reply, ECF 74 at 6-7. There is nothing showing, for example, that Citi behaved like a debt collector, rather than a servicer, with regard to Ademiluyi's loan once PennyMac acquired the debt.  *See* Amended Complaint, ECF 53; Plaintiff's Facts, ECF 60; Plaintiff's Memo, ECF 62-1; Plaintiff's Reply, ECF 72.

Accordingly, because plaintiff's loan was not in default within the meaning of the FDCPA when PennyMac acquired it, *see Bailey*, 154 F.3d at 387-88; *De Dios*, 641 F.3d at 1074, and because there is no evidence that PennyMac, through its agent, Citi, treated it as in default when PennyMac acquired the debt, *see Schlosser*, 323 F.3d at 358; *Bridge*, 681 F.3d at 362, PennyMac was not a "debt collector" with regard to Ademiluyi's loan.  Therefore, in this case, PennyMac is not subject to the FDCPA, and it is entitled to summary judgment.

### Conclusion

For the foregoing reasons, I will deny Plaintiff's Motion (ECF 62) and grant Defendant's Motion (ECF 69).  A separate Order follows, consistent with this Memorandum.


Date: May 22, 2015                          _____/s/_____
                                            Ellen Lipton Hollander
                                            United States District Judge